2012 UT 15

**STATE of Utah, Plaintiff and Respondent,**

v.

**Lemuel PRION, Defendant and Petitioner.**

No. 20090839.

Supreme Court of Utah.

March 20, 2012.

Mark L. Shurtleff, Att'y Gen., Kris C. Leonard, Asst. Att'y Gen., Salt Lake City, Joann Stringham, Uinta County, for plaintiff.

Michael D. Zimmerman, Troy L. Booher, Michael J. Thomas, Salt Lake City, for defendant.

Justice LEE authored the opinion of the Court, in which Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice PARRISH, and Justice NEHRING joined.

Justice LEE, opinion of the Court:

¶ 1 Lemuel Prion pled guilty and mentally ill to three felony charges in August 1994, pursuant to Utah Code section 77–16a–104(3).[1] Under the provisions of the statute, Prion was first sentenced to three terms of varying length, all to be served concurrently. As a part of this first sentence, Prion was committed to the Utah State Hospital for evaluation. After a stay of several months, Prion was released and reappeared before the district court for resentencing. Based on the recommendations of the mental health facility staff and administration, the district court resentenced Prion to serve his three terms consecutively, nearly doubling his prison time.

---

1. Citations to title 77 chapter 16a in this opinion are to the 1994 Utah Code, as the statute has been amended (albeit cosmetically, in ways that presumably would not alter the analysis) since Prion's conviction. All citations to other sections of the code refer to the version currently in force.

¶2 Claiming that his second sentence was statutorily barred and violated the Double Jeopardy Clause of the United States Constitution, Prion moved the district court to correct his sentence under rule 22(e) of the Utah Rules of Criminal Procedure. The district court denied the motion, and the Utah Court of Appeals affirmed that decision in an unpublished per curiam decision.

¶3 On certiorari we conclude that, although the sentencing statute at issue expressly allows for a recall and resentencing at any time during an eighteen-month review period, Prion's resentencing exceeded the bounds of the Double Jeopardy Clause in light of the nature and timeframe of this proceeding. Accordingly, we reverse the court of appeals and remand to the district court for further proceedings.

I

¶4 In August 1994, Lemuel Prion pled guilty and mentally ill to three felony charges stemming from two separate criminal cases. He pled guilty to possession of a dangerous weapon in a correctional facility, a second degree felony, in the first case; and aggravated assault and dealer in possession without affixing a tax stamp, both third degree felonies, in the second case.

¶5 On September 1, 1994, the district court conducted a plea hearing to ascertain, among other things, Prion's mental state under the Utah Code's guilty and mentally ill (GAMI) provisions. UTAH CODE §§ 77–16a–101 to –104, –202 (1994). Following expert testimony on Prion's mental health and medication history, the district court found that Prion posed an "immediate physical danger to himself or others, including jeopardizing his own or others' safety, health, or welfare if placed in a correctional or probation setting, or lacks the ability to provide the basic necessities of life, such as food, clothing, and shelter, if placed on probation." The court further found that "until [Prion's] medication [was] regulated he [could not] be committed to the Department of Corrections."

¶6 Pursuant to the GAMI statute, the district court sentenced Prion to three separate terms of 5 years, 0 to 5 years, and 1 to 15 years, disregarding his mental illness. See UTAH CODE § 77–16a–104(3) (1994).[2] Having imposed the sentence terms, the court thereafter ordered that Prion would serve his terms concurrently, amounting to a maximum of 15 years.

¶7 As a part of his GAMI sentence, the court also ordered that Prion be committed to the Utah State Hospital for care and treatment for a period of "no more than 18 months, or until he has reached maximum benefit." See id. § 77–16a–202(1)(b) (1994).[3] The district court expressly retained jurisdiction of the case "to alter or amend its order" and indicated that, following his commitment period with the State Hospital, Prion would again be brought before the court for reconsideration of his sentence. See id. (stating that after the offender's time at the department for care and treatment expires, "the court may recall the sentence and commitment, and resentence the offender").

¶8 Five months later, in January 1995, Prion was released from the State Hospital. In conjunction with this release, the hospital submitted a written report to the district court indicating that Prion had reached "maximum hospital benefit" and recommending that Prion "be engaged in some type of sex offender program." The report was accompanied by a "Review and Recommendation," outlining Prion's diagnosis, his violent behavior (including threats to patients and staff), his failure to cooperate with counseling, and the staff's general belief that he was "very dangerous."

2. Utah Code section 77–16a–104(3) (1994) instructs a sentencing court faced with a mentally ill offender to "impose any sentence that could be imposed under law upon a defendant who is not mentally ill and who is convicted of the same offense."

3. See also State v. Herrera, 1999 UT 64, ¶11 n. 5, 993 P.2d 854 ("Upon a plea and verdict of 'guilty and mentally ill,' the trial court imposes any sentence that could be imposed if the defendant were not mentally ill, but orders the defendant committed to the state hospital for care and treatment for no more than eighteen months, or until the defendant has reached maximum benefit, whichever occurs first.").

¶ 9 Following his release from the State Hospital, Prion appeared before the district court for resentencing on March 14, 1995. Based on its review of the State Hospital's reports and recommendations and Prion's history, the district court found that Prion posed a serious threat of violent behavior and criminal conduct and that his "attitude [was] not conducive to supervision." In light of these findings, the district court reimposed the same prison terms, but ordered that they run consecutively instead of concurrently. In doing so, the district court effectively increased Prion's maximum sentence from fifteen years to twenty-five years.

¶ 10 Nearly fifteen years later, on January 16, 2009, Prion filed a motion under rule 22(e) of the Utah Rules of Criminal Procedure seeking to vacate his second sentence. Prion argued that his second sentence was illegally imposed because (1) the court lacked statutory authority to increase his sentence following imposition of the first sentence and (2) the second sentence violated the Double Jeopardy Clause of the United States Constitution. The district court denied Prion's motion, reasoning that "the Double Jeopardy Clause only protects against re-sentencing when the defendant reasonably believes the original sentence is final," citing *State v. Maguire*, 1999 UT App 45, 975 P.2d 476. Since the GAMI statute specifically permits a court to recall and resentence the offender after his commitment at the State Hospital (a period of up to eighteen months), the court concluded that Prion had no legitimate expectation that his September 1994 sentence was final and therefore could lay no claim to double jeopardy.

¶ 11 In an unpublished per curiam decision, the court of appeals affirmed the denial of Prion's motion. *State v. Prion*, 2009 UT App 219U, 2009 WL 2469542 (per curiam). Following the same logic employed by the district court, the court of appeals reiterated that the Double Jeopardy Clause " 'only proscribes resentencing where the defendant has developed a legitimate expectation of the finality in his original sentence.' " *Id.* at para. 3 (quoting *Maguire*, 1999 UT App 45, ¶ 8, 975 P.2d 476). Without that expectation of finality, the court of appeals reasoned, "there

can be no violation of double jeopardy protections." *Id.*

¶ 12 The court of appeals therefore concluded that, because the GAMI statute allowed the district court to retain jurisdiction to alter or amend its original sentence and because the district court's order "expressly indicated that Prion's sentence would be reconsidered" upon his release from the State Hospital, Prion could not have legitimately expected that the September 1, 1994 order constituted his final sentence. *Id.* para. 4. Accordingly, the court of appeals affirmed the district court's denial of Prion's rule 22(e) motion.

¶ 13 Prion filed a petition for certiorari, which we granted. On certiorari, we owe no deference to the court of appeals. *State v. Arave*, 2011 UT 84, ¶ 24 & n. 9, 268 P.3d 163. Prion's claims that his sentence violates both the GAMI statutory regime and the double jeopardy protections of the United States Constitution present questions of law, which we review for correctness. *See State v. Samora*, 2004 UT 79, ¶ 9, 99 P.3d 858.

## II

¶ 14 Prion challenges the district court's denial of his motion to correct an illegal sentence on both statutory and constitutional grounds. He contends that the State lacked statutory authority to increase his sentence when it resentenced him and also asserts that an increase constitutes multiple punishment in violation of the Double Jeopardy Clause.

¶ 15 The State disagrees on both counts. It also asks us to affirm on an alternative, procedural ground—that rule 22(e) is not an appropriate vehicle for Prion's challenges to the legality of his sentence.

¶ 16 We uphold the procedural propriety of Prion's motion and acknowledge that the statute purports to allow a court to increase a mentally ill defendant's sentence on resentencing. We reverse on constitutional grounds, however, holding that an increase in a mentally ill defendant's sentence on resentencing under the GAMI statute infringes

the defendant's rights under the Double Jeopardy Clause of the Fifth Amendment.

## A

¶ 17 The State challenges Prion's motion on the procedural ground that under *State v. Candedo*, 2010 UT 32, 232 P.3d 1008, rule 22(e) motions should be limited to the correction of sentences that are "patently" or "manifestly" illegal. *See id.* ¶ 9 (citing *State v. Brooks*, 908 P.2d 856, 860 (Utah 1995), and *State v. Telford*, 2002 UT 51, ¶ 5, 48 P.3d 228). In the State's view, rule 22(e) should be reserved for the correction of sentences that are imposed outside the range authorized by statute or beyond the court's jurisdiction. Because Prion's sentence was authorized by statute and the district court had jurisdiction, the State asks us to affirm on the alternative procedural ground that rule 22(e) does not encompass challenges like the ones asserted by Prion.

¶ 18 In advancing this argument, the State acknowledges broad language in *Candedo* concluding that an "illegal sentence under rule 22(e) includes constitutional violations," *id.* ¶ 11, but suggests that we construe that language narrowly in a way that forecloses its invocation by Prion, *id.* ¶ 9 (noting that "rule 22(e) claims must be narrowly circumscribed to prevent abuse" (internal quotation marks omitted)). The State's challenge to Prion's 22(e) motion is rooted in a concern about a tension between the scope of rule 22(e) under *Candedo* and our rules of preservation, which ordinarily would foreclose challenges to a trial or sentence not raised during the initial proceedings but introduced for the first time years later.

¶ 19 Preservation rules are important, as they enhance efficiency and fairness and generally assure that most claims are raised and resolved in the first instance by the original trial court. *See State v. King*, 2006 UT 3, ¶ 13, 131 P.3d 202. Our rules of procedure recognize exceptions to this general rule, but most claims are barred if they are not presented in time to be resolved in the initial proceedings in the district court.[4] That general rule, moreover, extends to constitutional claims challenging the legal viability of a criminal conviction. *See Rudolph v. Galetka*, 2002 UT 7, ¶ 5, 43 P.3d 467 (Postconviction Remedies Act's procedural bars extend to "all claims, including constitutional questions").

¶ 20 Rule 22(e) is one of several narrow exceptions to the rule.[5] It preserves an avenue for a later, unpreserved challenge to the lawfulness of a criminal sentence, even on grounds not raised in the initial trial proceedings. Because an illegal sentence is treated as void, it may be raised "at any time." *Candedo*, 2010 UT 32, ¶ 9, 232 P.3d 1008 (internal quotation marks omitted). As we have recognized, however, this formulation, if broadly construed, raises the prospect of "'abuse.'" *Id.* (quoting *Telford*, 2002 UT 51, ¶ 5, 48 P.3d 228). The abuse we have warned of would be apparent, for example, if rule 22(e) were construed broadly to sanction a fact-intensive challenge to the legality of a sentencing proceeding asserted long after the time for raising it in the initial trial or direct appeal.[6] A parallel challenge to the proceeding leading to a defendant's conviction, after all, would be time-barred, *see generally* Postconviction Remedies Act, UTAH CODE §§ 78B–9–106, –107, and it would make

---

4. *See* UTAH CODE § 78B–9–106(1) ("A person is not eligible for [post-conviction] relief ... upon any ground that ... was raised or addressed at trial or on appeal ... [or] could have been but was not raised at trial or on appeal ...."); *id.* § 78B–9–107(1) (post-conviction remedies petitioner "is entitled to relief only if the petition is filed within one year after the cause of action has accrued"); UTAH R. CIV. P. 65C(h)(1) (requiring district court to review post-conviction petitions for frivolous or previously adjudicated claims and accordingly dismiss them).

5. The text of the rule provides that "[t]he court may correct an illegal sentence, or a sentence

imposed in an illegal manner, at any time." UTAH R.CRIM. P. 22(e).

6. *See, e.g., Hill v. United States*, 368 U.S. 424, 430, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962) ("[T]he narrow function of [the rule] is to permit correction at any time of an illegal sentence, not to re-examine errors occurring at the trial or other proceedings prior to the imposition of sentence."); *State v. Clements*, 148 Idaho 82, 218 P.3d 1143, 1146 (2009) (citing to "[a] number of state court jurisdictions" that have concluded "that the determination of whether a sentence is illegal ... is a legal question, and does not permit an evidentiary inquiry").

little sense to elevate challenges to sentencing proceedings over parallel challenges to the guilt phase of a trial.

■ ¶ 21 That concern does recommend a narrow construction of the constitutional challenges to a sentence that may be asserted pursuant to rule 22(e) under *Candedo*. But although there must be limits on the scope of rule 22(e) motions, we see no basis for foreclosing that avenue for the claims raised by Prion in this case. Both grounds he asserts to challenge his revised sentence are consistent with the traditional, established bases for a rule 22(e) motion, and we accordingly reject the State's procedural argument notwithstanding our acknowledgement of the need for a narrow construction of the rule.

¶ 22 Our rule 22(e) is based on an antecedent in the federal rules—rule 35(a) of the Federal Rules of Criminal Procedure,[7] which until 1987 authorized federal courts to correct illegal sentences.[8] Under this rule, the federal courts traditionally defined an "illegal sentence" to encompass instances "when the sentence imposed exceeds the statutorily-authorized limits, violates the Double Jeopardy Clause, or is ambiguous or internally contradictory."[9] This approach struck a careful balance between the goal of correcting illegal sentences on one hand and that of encouraging preservation and finality on the other.[10] The "illegal sentence[s]" that could be challenged "at any time" by rule were those whose defects would be apparent on their face—because they exceeded the limits of a statute or the Double Jeopardy Clause or because they were facially ambiguous or internally contradictory. Such defects, moreover, would not as strongly implicate rules of preservation because facial defects of these sorts could easily be corrected without the need for factual development in the original trial court.[11]

¶ 23 These limits, however, do not foreclose challenges like those asserted by Prion in this case. His statutory claim is essentially one that challenges his revised sentence as exceeding the limits of the governing statutory scheme. As explained below, Prion reads the GAMI statute to foreclose any increase in the sentence initially imposed. His rule 22(e) motion, therefore, is one that comes within the traditional bounds of the rule, and

7. *See* Fed.R.Crim.P. 35 (1950) ("[T]he court may correct an illegal sentence at any time."). Our rule 22(e) tracks the federal rule's original language. *See* Utah R.Crim. P. 22(e) ("The court may correct an illegal sentence, or a sentence imposed in an illegal manner, at any time.").

8. *See* Fed.R.Crim.P. 35(a) (1984) ("The court may correct an illegal sentence at any time and may correct a sentence imposed in an illegal manner within the time provided herein for the reduction of sentence."). Rule 35 was repealed effective November 1, 1987, however, and the new rule eliminated the "illegal sentence" language. *See* Sentencing Reform Act of 1984, Pub.L. No. 98–473, § 215, 98 Stat. 1837, 2014. The modern version, enacted in light of the newly adopted Federal Sentencing Guidelines, authorized courts to correct sentences only when they were the result of "arithmetical, technical, or other clear error." Fed.R.Crim.P. 35(a). Federal offenders facing allegedly illegal sentences today may still challenge the constitutional validity of their sentences through petitions for habeas corpus. *See* 28 U.S.C. § 2255.

9. *United States v. Pavlico*, 961 F.2d 440, 443 (4th Cir.1992); *see also Hill*, 368 U.S. at 430, 82 S.Ct. 468 (rejecting Rule 35(a) challenge where "[t]he punishment meted out was not in excess of that prescribed by the relevant statutes, multiple terms were not imposed for the same offense, nor were the terms of the sentence itself legally or constitutionally invalid in any other respect"); 26–635 Moore's Federal Practice Crim. Proc. § 635App.102, [3][b] (2011) ("[I]llegal sentences are essentially only those which exceed the relevant statutory maximum limits or violate double jeopardy or are ambiguous or internally contradictory.").

10. *See, e.g., State v. Thorkelson*, 2004 UT App 9, ¶¶ 14–16, 84 P.3d 854 (holding that rule 22(e) was not intended to correct "ordinary or 'run-of-the-mill' errors"); *see also Clements*, 218 P.3d at 1147 (Idaho version of the federal rule is "narrow," and "not a vehicle designed to reexamine the facts underlying the case to determine whether a sentence is illegal;" accordingly, its use "should be limited to uphold the finality of judgments").

11. *See Clements*, 218 P.3d at 1147; *see also* Utah R.Crim. P. 30(b) ("Clerical mistakes in judgments, orders or other parts of the record and errors in the record arising from oversight or omission may be corrected by the court at any time...."); Utah R. Civ. P. 60 (allowing a court to correct clerical mistakes "at any time" or relieve a party from the effects of a final judgment in the event of mistake or inadvertence within three months of entry of the judgment).

we accordingly uphold it against the State's procedural attack.

¶ 24 Prion's constitutional challenge is also procedurally proper. Double jeopardy challenges have long been understood to come within the scope of the federal antecedent to our rule 22(e), and we likewise uphold Prion's challenge under our rule. A sentence imposed in contravention of the Double Jeopardy Clause is an "illegal sentence"—even under a "narrowly circumscribed" construction of rule 22(e). *Candedo*, 2010 UT 32, ¶ 9, 232 P.3d 1008.

B

■ ¶ 25 On the merits of Prion's motion, we turn first to the statutory question. Prion's statutory argument is based on the GAMI statute's provision for a sentence "that could be imposed under law upon a defendant who is not mentally ill" and its requirement that the defendant be (a) committed to the state hospital; (b) subjected to probation; or (c) placed in the custody of the department of corrections. UTAH CODE § 77–16a-104(3) (1994). Although the statute authorizes a subsequent "recall" and "resentenc[ing]" of a defendant after an initial period of commitment to the state hospital, *id.* § 77–16a-202(1)(b) (1994), Prion asks us to construe that authority narrowly. Specifically, Prion argues that the "recall" and "resentenc[ing]" proceeding should be limited to a reconsideration of the defendant's *placement* (in the state hospital or with corrections), and not to encompass the *length* of the defendant' sentence.

¶ 26 This argument falters on the ground that it fails to credit the broad, ordinary meaning of the statutory term "resentence." It is certainly true that a defendant's initial sentence under the statute implicates a significant structural decision regarding the nature of the sentence and the placement of the defendant—whether the defendant should be placed on probation and, if not, whether his confinement should be under the supervision of the Department of Human Services (in the state hospital) or in the custody of the Department of Corrections (in prison). But that is not the only decision to be made at the time of sentencing. The initial sentencing decision includes, of course, the term or length of confinement. And if that is part of the initial sentencing, then a "recall" and "resentence," *id.* § 77–16a-202(1)(b) (1994), encompasses a *re*consideration of that aspect of the sentence as well.

¶ 27 Nothing in the ordinary meaning of the term "resentence" suggests a limitation of the sort advocated by Prion. If the initial "sentence" encompassed a decision regarding the length or term of confinement (as it obviously did), then so would a "resentence," as the prefix "re" simply means " 'again, anew, [or] over again.' " [12] Thus, Prion's notion of a "resentenc[ing]" limited to placement is incompatible with the statutory text, and we accordingly reject it.

¶ 28 The structure of the GAMI statute bolsters this conclusion. At the time of resentencing, the court is to consider mental health status reports on the offender, including reports of the danger the offender may pose to society and himself, his prognosis for remission of symptoms, the likelihood of recidivism, and the effectiveness of the mental health treatment he received. [13] All of these considerations could play into a judge's determination of the length of an offender's sentence, including, of specific relevance to this case, whether to run an offender's sen-

---

**12.** *Addis v. Smith*, 225 Ga. 157, 166 S.E.2d 361, 363 (1969) (quoting WEBSTER'S NEW WORLD DICTIONARY OF THE AMERICAN LANGUAGE 1209 (1966)); *see also Belfont Sales Corp. v. United States*, 666 F.Supp. 1568, 1572 (Ct. Int'l Trade 1987) ("[T]he prefix 're' means 'again.' "); *id.* at 1572 n. 11 (stating that "re" means "*Again;*—used chiefly to form words, esp. verbs, of action, denoting in general *repetition* (of the action of the verb), or *restoration* (to a previous state)" (quoting WEBSTER'S NEW INT'L DICTIONARY OF THE ENGLISH LANGUAGE 2070 (2d ed. 1945))).

**13.** *See* UTAH CODE §§ 77–16a-202(3), –203 (1994). These sections require the Department of Human Services to prepare and submit regular reports to the district court on the status of offenders being treated by a mental health facility under the GAMI statute. Reports are to include updates on the offender's current mental condition, progress since commitment, prognosis, the potential for recidivism, estimates of the offender's dangerousness to himself or others, and recommendations for future treatment. *Id.* § 77–16a-203 (1994).

tences concurrently or consecutively.[14] This structure thus confirms what is already evident in the ordinary meaning of the statute's text, which is that a "resentence" encompasses not just a reconsideration of the offender's placement but also of the term or length of his confinement.[15]

¶ 29 We therefore hold that the GAMI statute aims to permit a district court to recall, resentence, and even increase an offender's sentence following his commitment and release from the state hospital. We affirm the decision of the court of appeals insofar as it implicitly endorsed this reading of the statute.

### C

¶ 30 Prion also challenges the proceeding increasing his sentence on double jeopardy grounds. The constitutional guarantee against double jeopardy "has been said to consist of three separate constitutional protections. It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), *overruled in part on other grounds by Alabama v. Smith*, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989).

¶ 31 A "primary purpose" of the Double Jeopardy Clause is "to preserve the finality of judgments." *Crist v. Bretz*, 437 U.S.

28, 33, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978). But the clause is also concerned with the "personal strain, public embarrassment, and expense of a criminal trial more than once for the same offense." *Abney v. United States*, 431 U.S. 651, 661, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977). Thus, the core of the double jeopardy guarantee is a prohibition of a "second trial following an acquittal." *Arizona v. Washington*, 434 U.S. 497, 503, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). "If the innocence of the accused has been confirmed by a final judgment, the Constitution conclusively presumes that a second trial would be unfair." *Id.*

¶ 32 The Constitution also proscribes the imposition of multiple punishments for the same offense. *See Ex parte Lange*, 85 U.S. (18 Wall.) 163, 176, 21 L.Ed. 872 (1873). Yet the double jeopardy protection against retrial does not extend with equal force to resentencing. "The imposition of a particular sentence usually is not regarded as an 'acquittal' of any more severe sentence that could have been imposed." *Bullington v. Missouri*, 451 U.S. 430, 438, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981). Accordingly, "the guarantee against double jeopardy neither prevents the prosecution from seeking review of a sentence nor restricts the length of a sentence imposed upon retrial after a defendant's successful appeal." *Monge v. California*, 524 U.S. 721, 730, 118 S.Ct. 2246, 141 L.Ed.2d 615 (1998).

---

14. *See id.* § 76–3–401(2) (1994) ("A court shall consider the gravity and circumstances of the offenses and the history, character, and rehabilitative needs of the defendant in determining whether to impose consecutive sentences"); *accord id.* § 76–3–401(2) ("In determining whether state offenses are to run concurrently or consecutively, the court shall consider the gravity and circumstances of the offenses, the number of victims, and the history, character, and rehabilitative needs of the defendant.").

15. In support of his statutory argument, Prion also cites section 76–3–405(1) of the Utah Code, which prohibits the imposition of a harsher sentence "[w]here a ... sentence has been set aside on direct review or on collateral attack." Prion argues that the thrust of this statute is "to protect a defendant's right to appeal by eliminating the chilling effect the threat of an increased sentence

after a successful appeal might have on the exercise of appellate rights." That may be, but section 76–3–405 is inapplicable here for two reasons. First, GAMI resentencing is not the result of appellate review or collateral attack; it is an ongoing procedure directed by the trial court. Second, section 76–3–405 does not extend to circumstances where "the increased sentence is based on facts which were not known to the court at the time of the original sentence, and the court affirmatively places on the record the facts which provide the basis for the increased sentence." UTAH CODE § 76–3–405(2)(a). Prion's resentencing was based on newly gathered information that was not available to the court during the original sentencing, which evidence was noted on the record during the resentencing proceeding. Section 76–3–405 is accordingly inapplicable here.

¶ 33 "Thus it may be said with certainty that history demonstrates that the common law never ascribed such finality to a sentence as would prevent a legislative body from authorizing its appeal by the prosecution." *United States v. DiFrancesco,* 449 U.S. 117, 134, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980); *see also id.* at 132, 101 S.Ct. 426 (upholding prosecution's statutory right to appeal a defendant's sentence against double jeopardy challenge). By the same token, standard, established procedures for resentencing—for example, on a motion to correct an error in a sentence, *see Bozza v. United States,* 330 U.S. 160, 166–67, 67 S.Ct. 645, 91 L.Ed. 818 (1947), or on a retrial after a successful appeal by a defendant, *see Pearce,* 395 U.S. at 719–20, 89 S.Ct. 2072 [16]—do not run afoul of the Double Jeopardy Clause. In this sense, it has been said that "double jeopardy principles have no application in the sentencing context." *Id.*

¶ 34 That statement, however, cannot be taken to its literal extreme. The government could not, for example, circumvent the strictures of the Double Jeopardy Clause by styling a new prosecution for a past offense as a mere "resentencing." At some point, the imposition of a new punishment could be deemed to raise double jeopardy concerns even absent a new trial formally addressed to the question of the defendant's guilt.[17] *See, e.g., Ex parte Lange,* 85 U.S. 163.

¶ 35 This case requires us to delineate the boundary between the sorts of resentencing proceedings that fall outside the double jeopardy prohibition and those that impose multiple punishments raising constitutional concerns. The constitutional question presented here is whether a resentencing proceeding under the GAMI statute falls on the permissible or prohibited side of that line.

¶ 36 In defending the GAMI resentencing regime, the State insists that the clear language of the statute defeats any reasonable expectation of finality on Prion's part. This argument is premised on language in *DiFrancesco,* 449 U.S. 117, 101 S.Ct. 426, tying the decision to uphold the prosecution's statutory right to appeal a defendant's sentence to the clarity of the statutory language. Quoting Justice Blackmun's opinion for the Court in *DiFrancesco,* the State characterizes the decision as hinging on the fact that the government's statutory right to appeal was "clear and specific," thus depriving the defendant of any reasonable expectation of finality in his sentence. 449 U.S. at 139, 101 S.Ct. 426. Because the GAMI statute's resentencing proviso is equally "clear and specific," the State insists that it withstands double jeopardy review under *DiFrancesco.* Under this reading of *DiFrancesco,* the State contends, Prion never acquired a reasonable expectation of finality in his initial GAMI sentence and thus the State retained the discretion to resentence him without implicating his constitutional rights under the Double Jeopardy Clause.

¶ 37 We reject this reading of *DiFrancesco.* The clear, explicit nature of a legislative incursion on a defendant's expectation of the finality of a judgment or sentence cannot be the end of the double jeopardy inquiry. If that were the sum and substance of this constitutional guarantee, the legislature would have unfettered power to authorize multiple punishments for a sin-

**16.** A narrow exception to this general rule was recognized in *Bullington v. Missouri,* which found a double jeopardy problem in a case that subjected a capital defendant to the death penalty in a new trial after the defendant's successful appeal from a conviction resulting in a sentence of life imprisonment. 451 U.S. 430, 446, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981). But the rule in *Bullington* turned on the unique nature of capital cases, in which "evidence [is] introduced in a separate proceeding that formally resemble[s] a trial," *Arizona v. Rumsey,* 467 U.S. 203, 209, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984), and the "embarrassment, expense and ordeal" and the "anxiety and insecurity" faced by the capital defendant at sentencing is "at least equivalent to that faced by any defendant at the guilt phase of a criminal trial," *Bullington,* 451 U.S. at 445, 101 S.Ct. 1852 (internal quotation marks omitted).

**17.** *See United States v. Fogel,* 829 F.2d 77, 88 (D.C.Cir.1987) ("The [Double Jeopardy Clause] applies to 'multiple punishment' because, if it did not apply to punishment, then the prohibition against 'multiple trials' would be meaningless; a court could achieve the same result as a second trial by simply resentencing a defendant after he has served all or part of an initial sentence.").

gle offense so long as it did so in unmistakable terms and deemed the new proceeding a resentencing.

¶ 38 We do not read *DiFrancesco* to so enfeeble this fundamental constitutional right. The double jeopardy landscape under *DiFrancesco* is not as broadly brushed as the State suggests. *DiFrancesco* upholds the propriety of a resentencing on a new trial after a successful appeal, but it does so not solely on the basis of the "clear and specific" nature of the statutory provision for review of a defendant's sentence upon appeal by the prosecution, *id.*, but also in light of the nature of the resentencing proceeding. Specifically, and as explained in greater detail below, the *DiFrancesco* decision turned in substantial part on the fact that the resentencing it upheld involved historically " 'well established' " mechanisms for the correction of improper sentences within limited time frames and did not involve a "retrial or approximate the ordeal of a trial." *id.* at 134–36, 101 S.Ct. 426 (quoting *Pearce*, 395 U.S. at 720, 89 S.Ct. 2072).

¶ 39 Thus, *DiFrancesco* does not give *carte blanche* authority for any resentencing whose statutory prescription is clear and explicit. It suggests, rather, that the constitutionality of such a proceeding depends on a number of factors, such as whether the particular resentencing proceeding at issue has an established pedigree, occurs within a limited timeframe, and approximates the ordeal of a new trial.

¶ 40 Applying these factors, we hold that the state's resentencing of Prion under the GAMI statute crosses the constitutional line established by the Double Jeopardy Clause. Our holding is based on the grounds that Prion's resentencing (1) came under a *sui generis* resentencing procedure established under the GAMI statute, not one of the historically established mechanisms for resentencing endorsed in the double jeopardy case law; (2) occurred outside the time limits that would apply to established mechanisms for correcting an improper sentence; and (3) considered new evidence not presented or even available in Prion's initial trial and sentencing.

¶ 41 In cases upholding resentencing proceedings against double jeopardy challenges, the United States Supreme Court has emphasized the historical pedigree of the resentencing mechanism at issue. In *Bozza v. United States,* 330 U.S. 160, 67 S.Ct. 645, 91 L.Ed. 818 (1947), for example, the court upheld the correction of an unlawful sentence by a trial court on the ground that "[i]t is well established that a sentence which does not comply with the letter of the criminal statute which authorizes it is so erroneous that it may be set aside on appeal or in habeas corpus proceedings." *Id.* at 166, 67 S.Ct. 645 (citations omitted). The sentence initially imposed in *Bozza* was for a term of imprisonment (but no fine) for a crime carrying a mandatory minimum sentence requiring the imposition of a fine *and* imprisonment. *Id.* at 165, 67 S.Ct. 645 (citing 26 U.S.C. § 2833(a)). In upholding the district court's correction of that sentence to add the required fine, the *Bozza* Court cited the settled procedural practice allowing "an appropriate amendment of [an] invalid sentence by the court of original jurisdiction, at least during the term of court in which the invalid sentence was imposed." *Id.* at 166, 67 S.Ct. 645. Such correction was deemed not to raise double jeopardy problems, at least in part in light of the availability of settled procedural mechanisms aimed at avoiding the prospect of "a game in which a wrong move by the judge means immunity for the prisoner." *Id.* at 166–67, 67 S.Ct. 645.

¶ 42 The Court's endorsement in *Pearce,* 395 U.S. 711, 89 S.Ct. 2072, of the government's right to seek an increased sentence on a retrial after a defendant's successful appeal rested on similar grounds. In *Pearce,* the court noted the "[l]ong-established" principle that "double jeopardy imposes no restrictions upon the length of a sentence imposed upon reconviction," emphasizing the "settled" practice of the courts and the "unbroken line of decisions" upholding "the power, upon the defendant's reconviction, to impose whatever sentence may be legally authorized, whether or not it is greater than the sentence imposed after the first conviction." *Id.* at 719–21, 89 S.Ct. 2072.

¶43 The resentencing mechanism upheld in *DiFrancesco* had a similarly established pedigree. In endorsing the government's statutory right to challenge the lawfulness of the defendant's sentence on appeal, *DiFrancesco* noted the "established practice in the federal courts" of allowing a sentencing judge to "recall the defendant and increase that sentence, at least … so long as he has not yet begun to serve his sentence," and emphasized that "history demonstrates that the common law never ascribed such finality to a sentence as would prevent a legislative body from authorizing its appeal by the prosecution." 449 U.S. at 134, 101 S.Ct. 426 (citations omitted). "Indeed," the Court observed, "countries that trace their legal systems to the English common law" consistently "permit such appeals." *Id.*

■ ¶44 Prion's resentencing under the GAMI statute bore no relation to any of the standard procedural mechanisms upheld in these decisions. He was not resentenced on a motion to correct a mistake in sentencing, as in *Bozza.* Nor was his new sentence fixed after or upon an appeal, as in *Pearce* or *DiFrancesco.* Instead, Prion's new sentence was imposed in a de novo hearing convened at the end of a lengthy period of evaluation during his confinement in the state hospital. The State has not identified any traditional or historical basis for such a resentencing. The lack of such a pedigree is a factor that cuts against this resentencing proceeding under the Double Jeopardy Clause.

2

¶45 The cases upholding resentencing proceedings against double jeopardy challenges have also noted the limited timeframe in which those proceedings have taken place. In *DiFrancesco,* the Court noted that the timeframe for a challenge to a sentence on appeal was appropriately brief, acknowledging that, although an "appeal may prolong the period" of a defendant's anxiety over the prospect of additional jeopardy for his

behavior, that anxiety is limited to "the finite period provided by the statute." *DiFrancesco, Id.* at 136, 101 S.Ct. 426.

¶46 For DiFrancesco, this finite period of anxiety was short—the time available to press an appeal.[18] The "dangerous special offender" statute at issue in that case did permit the sentencing court to grant an extension of the time for taking a review of the sentence, but the sentencing court could only extend the time by a maximum of thirty days beyond " 'the expiration of the time otherwise prescribed by law.' " *Id.* at 120 n. 2, 101 S.Ct. 426 (quoting 18 U.S.C. § 3576). Moreover, this thirty-day extension was available only to convicted offenders; the United States was prohibited from obtaining such an extension for review. *Id.*

¶47 The timeframe for the correction of the defendant's sentence in *Bozza* was even more limited. The Court's opinion in that case emphasized that the trial court's decision to correct the sentence that omitted a statutorily required fine happened "about five hours after the sentence was announced." 330 U.S. at 165, 67 S.Ct. 645. This resentencing seems parallel to a motion under rule 60(b) to correct a judgment on grounds of mistake, a motion required to be made within three months of the court's judgment.[19]

¶48 These limited timeframes are of constitutional significance under the Double Jeopardy Clause. *DiFrancesco* alluded to this point, noting that historically "[t]he trial court's increase of a sentence, *so long as it took place during the same term of court,* was permitted …. [and] not thought to violate any double jeopardy principle." 449 U.S. at 133–34, 449 U.S. 117 (emphasis added) (citing *Ex parte Lange,* 85 U.S. (18 Wall.) at 167; *Ex parte Lange,* 85 U.S. at 192–94 (Clifford, J., dissenting); 3 EDWARD COKE, INSTITUTES § 438 (13th ed. 1789)). Our own historical research confirms this assertion.

¶49 Double jeopardy's historical roots run deep. The seeds of this foundational princi-

---

**18.** *See* FED. R. APP. P. 4(b)(1) (1979). At the time of his case, DiFrancesco would have had fourteen days following the entry of the sentencing order against him within which he could appeal the sentence as a matter of right. *Id.*

**19.** *See* UTAH R. CIV P. 60(b).

ple were sewn as far back as the inception of the English common law under the reign of Henry II.[20] And throughout the relevant common law period, the courts embraced a system under which a court's authority to revise its judgments (including criminal sentences) was restricted to the timeframe comprising a "term" of the court. As Lord Coke explained,

> during the term wherein any judicial act is done, the record remaineth in the breast of the judges of the court, and in their remembrance, and therefore the roll is alterable during that term, as the judges shall direct; but when that term is past, then the record is in the roll, and admitteth of no alteration, averment or proof to the contrary.

3 EDWARD COKE, INSTITUTES § 438 at 260.

¶ 50 The common law's "terms of court" grew out of what was once "one continual term for hearing and deciding cases." 3 WILLIAM BLACKSTONE, COMMENTARIES 275–76 (1769). Eventually, the church interposed and "exempted certain holy seasons from being profaned by forensic litigation." *Id.* As Blackstone explained, the terms were "gradually formed from the canonical constitutions of the church; being indeed no other than those leisure seasons of the year which were not occupied by great festivals or fasts." *Id.* The English courts therefore convened only during specific terms falling between the most important of Christian holidays. *Id.* at 276.[21] Outside these terms,

which varied from year to year due to seasonal and lunar holidays but typically lasted somewhere between three and six weeks,[22] common law courts lacked power to revise their decisions rendered in prior terms.

¶ 51 The common law courts abided by the finality of the terms of court with such exactness that "matters which were not disposed of at a term had to be started over" in the next term.[23] This meticulous adherence to the terms system resulted in procedural bars on both amending final orders once the term expired and continuing trials from one term to the next.[24]

¶ 52 Through the eighteenth and nineteenth centuries, common law courts continued to observe the term of court system, retaining the power to substantively amend previously imposed judgments or sentences so long as they did so during the same term of court.[25] Early American courts adopted this same framework. As one nineteenth-century Massachusetts court noted, "[a] judge of the ... court has power to revise and increase a sentence imposed upon a convict, during the same term of court, and before the original sentence has gone into operation, or any action has been had upon it." *Commonwealth v. Weymouth*, 84 Mass. (2 Allen) 144, 144, 1861 WL 6176 (1861). The court clarified that this authority was rooted in the common law practice wherein "the record is not finally made up until the end of the term or session of the court, when 'the roll,' as it is called, is signed and returned."

---

**20.** Joshua C. Tate, *Ownership and Possession in the Early Common Law*, 48 AM. J. LEGAL HIST. 280, 280 (2006) ("Many scholars have viewed the reign of Henry II (d. 1189), the medieval English king most associated with legal reform, as pivotal in the development of the common law.").

**21.** *See also* MICHAEL JONES, A HANDBOOK OF DATES FOR STUDENTS OF ENGLISH HISTORY 98–99 (2000). Several statutes passed at various points in English history attempted to more precisely define the terms. By 1831, the "dates of the terms were fixed as follows: Hilary, 11–31 Jan.; Easter, 15 April–8 May; Trinity, 22 May–12 June; Michaelmas, 2–25 November." *Id.* at 103; *see also* 1 Will. 4, c. 70.

**22.** *See* JONES, *supra* ¶ 50 n. 21, at 98–99.

**23.** 3 BLACKSTONE'S COMMENTARIES ON THE LAW 709 (Bernard C. Gavit ed., 1941).

**24.** *Id.* ("[A] final judgment [was] not ... disturbed after the term at which it was entered ha[d] expired unless a proper motion for a new trial was filed within a designated time.").

**25.** The term of court system was eventually abolished in England as part of the Judiciary Act of 1873. Although most American states have similarly abolished the term system, some still retain relics of it in their law. *See, e.g., Dunlap v. State*, 70 So.3d 1140, 1143 (Miss.Ct.App.2011), (affirming a district court resentencing because the "judge exercised his inherent authority to alter a sentence until [the] regular term of court expires" (alteration in original) (internal quotation marks omitted)) *cert. denied*, 69 So.3d 767 (Miss. 2011).

*Id.* at 145. Until then, the court explained, "it remains in the control of the court, and no entry therein is deemed to be final, or beyond the power of the court to amend or alter it, either for error or other sufficient cause." *Id.*

¶ 53 This historical record underscores the constitutional significance of the timeframe of a proceeding to subject a criminal defendant to resentencing. The framers of the Double Jeopardy Clause were undoubtedly familiar with the limits of the common law terms of court, including on a court's authority to revise a prior sentence.[26] And thus they would have seen a resentencing proceeding in a new term as legally questionable, as the court intimated in *DiFrancesco* and *Ex Parte Lange.*

¶ 54 Of course the common law notion of a term of court is no longer with us today. But we have adopted modern analogs. The principal time bar to revising a judgment in modern law is in our procedural rules for post-judgment relief, such as rule 60 of the Utah Rules of Civil Procedure (and its federal counterpart). When the federal rule was adopted, its drafters indicated an intent to abolish the term of court regime and replace it with a more equitable, orderly system of post-judgment relief. *See* 7 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE

§ 60App.100 (3d ed. 2011). The federal rule drafters expressed concerns with the common law term of court system, under which "the time for vacating a judgment rendered early in a term was much longer than for a judgment rendered near its end." *Id.* Yet they still acknowledged a need for time limits to facilitate finality, adopting a six-month time limit for most motions for relief from a judgment. *Id.*[27] (Utah later adopted its own rule 60(b),[28] modeled after the federal rule, but our rule sets a general three-month time limit. UTAH R. CIV. P. 60.[29])

¶ 55 The resentencing proceeding for Prion under the GAMI statute happened well outside the finite, limited timeframe for an appeal or a motion for post-judgment relief. Prion was resentenced more than six months after he began serving his initial sentence.[30] The extensive time between Prion's initial sentence and the resentencing hearing would undoubtedly have been deemed problematic in the common law era in which the Double Jeopardy Clause was adopted. A common law court, in fact, would have lacked power to revise a sentence after such an extended period of time,[31] which would have spanned more than one and perhaps several different terms of court. It is significant, moreover, that Prion's resentencing occurred well outside the time frame for any motion for post-

---

26. *See* William S. McAninch, *Unfolding the Law of Double Jeopardy,* 44 S.C. L.REV. 411, 414–16 (1993) ("The basic English common-law protections were well known to colonial lawyers through Coke's Institutes and Blackstone's Commentaries."); *see also United States v. Wilson,* 420 U.S. 332, 340–41, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975) ("[T]he Double Jeopardy Clause .... [tracked] the more traditional language employing [Blackstone's] familiar concept of jeopardy." (internal quotation marks omitted)).

27. Later, the committee extended the timeframe to file a 60(b) motion to up to one year under certain circumstances. FED.R.CIV.P. 60 advisory committee's note to 1946 amendment.

28. UTAH R. CIV. P. 60(b). Although rule 60(b) is a rule of civil procedure, we have allowed criminal defendants to avail themselves of it. *See, e.g., Menzies v. Galetka,* 2006 UT 81, ¶ 2, 150 P.3d 480. The civil rules themselves authorize the use of 60(b) in criminal proceedings: "These rules of [civil] procedure shall also govern in any aspect of criminal proceedings where there is no other applicable statute or rule, provided, that any rule

so applied does not conflict with any statutory or constitutional requirement." UTAH R. CIV. P. 81(e).

29. Utah's rule 60(b) provides courts a mechanism to "relieve a party ... from a final judgment, order, or proceeding" for a variety of reasons. UTAH R. CIV. P. 60(b). Unless the judgment is void, has been "satisfied, released, or discharged," or is otherwise rendered invalid, litigants must move for relief under this rule within three months. *Id.*

30. Prion's six-month review, moreover, was perhaps on the shorter end of the resentencing proceedings authorized under the GAMI statute, which permits resentencing as late as eighteen months after the initial sentence is entered.

31. *United States v. Mayer,* 235 U.S. 55, 67, 35 S.Ct. 16, 59 L.Ed. 129 (1914) ("In the absence of statute providing otherwise, the general principle obtains that a court cannot set aside or alter its final judgment after the expiration of the term at which it was entered....").

judgment relief, which is the modern analog to the common law term of court.

¶ 56 We need not—and do not—hold that a resentencing proceeding beyond the deadline for a motion for post-judgment relief is a per se breach of the double jeopardy guarantee. We simply conclude that the timing of a defendant's resentencing has constitutional significance—that the extent of the delay between the initial and subsequent sentencing weighs in favor of a defendant's double jeopardy challenge to the resentencing. And where, as here, the defendant's resentencing took place more than six months after the original sentence was handed down in a proceeding that bore no relation to any traditional, established mechanism for resentencing, we find that the sentencing scheme ran afoul of the Double Jeopardy Clause, particularly given the nature of the proceeding (as explained below).

3

¶ 57 Finally, the cases upholding resentencing proceedings against double jeopardy attacks have emphasized the limited nature of the proceedings at issue. In *DiFrancesco,* for example, the Court recalled the "central" objective of the Double Jeopardy Clause of providing a "barrier to affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." *DiFrancesco,* 449 U.S. at 128, 101 S.Ct. 426 (internal quotation marks omitted). And although a new hearing allowing the prosecution to introduce new evidence would inappropriately "provide the prosecution [with] a second crack" at presenting its case, *id.* at 140, 101 S.Ct. 426 (internal quotation marks omitted), the Court in *DiFrancesco* noted that the prosecution's appellate challenge to the "dangerous special offender" sentence did no such thing. Instead, the Court emphasized that the "limited appeal" under the statute "d[id] not involve a retrial or approximate the ordeal of a trial on the basic issue of guilt or innocence" but was

"essentially on the record of the sentencing court." *Id.* at 136, 101 S.Ct. 426.

¶ 58 In reviewing the propriety of other sentencing proceedings, the Court has explored whether they bear "the hallmarks of [a] trial on guilt or innocence." *Bullington,* 451 U.S. at 439, 101 S.Ct. 1852. Likewise, the Court has evaluated whether the "embarrassment, expense and ordeal" as well as the "anxiety and insecurity" that a defendant must endure approximate or are equivalent to "that faced by any defendant at the guilt phase of a criminal trial." *Id.* at 445, 101 S.Ct. 1852 (internal quotation marks omitted).[32] In finding a double jeopardy bar to a new penalty-phase proceeding in a capital case in *Bullington,* for example, the court distinguished the penalty phase of a capital trial from the resentencing proceedings upheld in prior cases. Specifically, the *Bullington* court noted that in those cases "there was no separate sentencing proceeding at which the prosecution was required to prove … additional facts in order to justify the particular sentence." *Id.* at 439, 101 S.Ct. 1852.

¶ 59 The case law's focus on the nature of the resentencing proceeding has roots in broader double jeopardy principles. It has been said that the Double Jeopardy Clause "prevents the State from honing its trial strategies and perfecting its evidence through successive attempts at conviction." *Tibbs v. Florida,* 457 U.S. 31, 41, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Moreover, "[r]epeated prosecutorial sallies would unfairly burden the defendant and create a risk of conviction through sheer governmental perseverance." *Id.* This protection is paramount to double jeopardy because, as the *DiFrancesco* Court explained, a second chance at gathering and producing evidence might allow the government to "wear down a defendant" with its superior resources and obtain a conviction where it otherwise might fail. *See* 449 U.S. at 130, 101 S.Ct. 426. In

**32.** *Bullington* was perhaps unique in that it involved a capital sentencing proceeding, which was "in many respects a continuation of the trial on guilt or innocence of capital murder." *Monge v. California,* 524 U.S. 721, 732, 118 S.Ct. 2246, 141 L.Ed.2d 615 (1998). We find *Bullington's* analysis instructive, however, insofar as the Court looked to these "hallmarks" of a trial to determine the legitimacy of the sentencing scheme under the Double Jeopardy Clause. 451 U.S. at 439, 101 S.Ct. 1852.

other words, after "the government has failed to prove its case," it should not be afforded a "second bite at the apple." *Burks v. United States,* 437 U.S. 1, 15, 17, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) (internal quotation marks omitted).

¶ 60 At its core, the Double Jeopardy Clause serves as a protective barrier between the individual defendant (with limited resources and high personal stakes in the outcome) and the state (with extensive resources and little anxiety arising from the outcome of the case). Although some resentencing proceedings will not approximate the ordeal of a trial, others will, in the sense that they furnish "the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." [33] And in those cases, the nature of the resentencing proceeding is a factor weighing in favor of the defendant who raises a double jeopardy challenge.

¶ 61 Prion's GAMI resentencing proceeding implicates these concerns. In contrast to the dangerous special offender scheme at issue in *DiFrancesco,* the GAMI statute allows for additional evidence to be gathered and presented to the court in a subsequent hearing. Although the ultimate determination of guilt or innocence has already been made, the GAMI resentencing approximates the ordeal of a trial in that substantive reviews and recommendations are made to the court based on new evidence gathered in connection with the offender's mental health evaluations. For that reason, a GAMI resentencing proceeding bears some of the hallmarks of a trial and implicates core double jeopardy concerns.

¶ 62 Again, we do not suggest that a resentencing proceeding could never conform to the requirements of double jeopardy if it involved the presentation of new evidence. But where such a proceeding does not resemble a traditionally accepted mechanism for reopening a final judgment, and where it is convened well after the standard timeframe for such review, we find a double jeopardy violation in a proceeding that allows the prosecution to reopen the initial sentencing decision on a *de novo* basis in light of evidence that is gathered subsequent to the initial judgment and sentence.

## III

¶ 63 We affirm the procedural propriety of Prion's rule 22(e) motion and recognize that the GAMI statute purports to allow the district court to increase his sentence. We reverse, however, on double jeopardy grounds.

¶ 64 We recognize that a resentencing proceeding is not the equivalent of a retrial for double jeopardy purposes. The constitution leaves more leeway for the state to reconsider a defendant's sentence than to reevaluate his guilt. But that leeway is not absolute. If the state resentenced a convicted defendant after he had already served most of his time—doubling his sentence, for example, based on new evidence of dangerousness presented by the prison warden— that would surely raise the double jeopardy concern of a multiple punishment for the same offense. Such a proceeding, moreover, would not escape double jeopardy scrutiny just because its prospect was clearly announced in the governing sentencing statutes. A defendant's expectation of finality is relevant to the double jeopardy analysis, but the state cannot evade this constitutional guarantee simply by making the possibility of increased punishment clear on the face of its sentencing scheme.

¶ 65 The state's resentencing of Prion under the GAMI statute is problematic under a proper understanding of the Double Jeopardy Clause. Prion was resentenced months after his initial sentence was entered. And his sentence was nearly doubled in a *sui generis* proceeding based on new evidence gathered during the course of his confinement. We find this resentencing to cross the

---

**33.** *Burks v. United States,* 437 U.S. 1, 11, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *see also DiFrancesco,* 449 U.S. at 128, 101 S.Ct. 426 (" '[C]entral to the objective of the prohibition against successive trials' is the barrier to 'affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding.' ") (quoting *Burks,* 437 U.S. at 11, 98 S.Ct. 2141); *McNair v. Hayward,* 666 P.2d 321, 323 (Utah 1983) (same).

line established by the Double Jeopardy Clause, and thus reverse and remand for further proceedings consistent with this opinion.