Justice PARRISH,
opinion of the Court:
INTRODUCTION
[1 Andy Rasabout fired twelve shots at a house in a gang-related drive-by shooting,. A jury convicted him of twelve felony counts of unlawful discharge of a firearm, in violation of Utah Code section 76-10-508. The trial *1261 court merged the twelve counts into one, but the court of appeals reversed. We granted Mr. Rasabout's petition for certiorari and now affirm the ruling of the court of appeals, holding that the allowable unit of prosecution for unlawful discharge of a firearm is each discrete shot.
BACKGROUND
12 Mr. Rasabout is a member of the street gang known as the Tiny Oriental Posse. On November 1, 2007, Mr. Rasabout, riding shotgun in a Honda Civic, fired twelve shots from a Glock 9 mm semiautomatic pistol at a house and a car parked in front. Lee Tran, whom Mr. Rasabout knew to be a rival in the Original Laotian Gangsters, owned the car and was inside the house at the time. But Mr. Tran was not the only person in danger. Two young girls and their mother were asleep upstairs. Several others were playing cards in the basement. And one man was standing in the carport, enjoying the crisp morning air and a cigarette.
18 A jury convicted Mr. Rasabout of twelve felony counts of unlawful discharge of a firearm, in violation of Utah Code section 76-10-508. At Mr. Rasabout's request, the trial court merged the twelve counts and sentenced Mr. Rasabout on the basis of one conviction. The court of appeals concluded that the trial court erred and ordered that court to resentence Mr. Rasabout on all twelve convictions.[1] We granted Mr. Rasa-bout's petition for certiorari and have jurisdiction pursuant to Utah Code section 78A 3-102(8)(a).
STANDARD OF REVIEW
[4 On certiorari to the Utah Court of Appeals, we review the decision of that court for correctness; we do not review the decision of the trial court.[2]
ANALYSIS
1 5 When Mr. Rasabout fired twelve shots into a house that he knew to be occupied by a rival gang member, Utah Code section 76-10-508 provided,
(1)(a) A person may not discharge any kind of dangerous weapon or firearm:
(i) from an automobile or other vehicle;
i) from, upon, or across any highway;
[[Image here]]
(vil) without written permission within 600 feet of ... a house, dwelling, or any other building;
[[Image here]]
(2) A violation of any provision of this section is a class B misdemeanor unless the actor discharges a firearm under any of the following cirenmstances ..., in which case it is a third degree felony and the convicted person shall be sentenced to an enhanced minimum term of three years in prison:
(a) the actor discharges a firearm in the direction of any person or persons, knowing or having reason to believe that any person may be endangered;
(b) the actor, with intent to intimidate or harass another or with intent to damage a habitable structure ..., discharges a firearm in the direction of any building; or
(c) the actor, with intent to intimidate or harass another, discharges a firearm in the direction of any vehicle.[3]
Pursuant to this statute, a jury convicted Mr. Rasabout of twelve felony counts of unlawfal discharge of a firearm. The trial court merged the twelve counts into one. The court of appeals reversed this ruling, reasoning that the allowable unit of prosecution for the offense is each discrete shot. Thus, the court concluded that the twelve discrete shots Mr. Rasabout fired support twelve convictions. We affirm the court of appeals.
16 Our analysis proceeds in three parts: First, we hold that the allowable unit of prosecution for unlawful discharge of a firearm is each discrete shot; accordingly, Mr. Rasabout was properly convicted of and may be punished for twelve separate counts because he fired twelve discrete shots. Second, we reject as inapplicable the single criminal episode statute and the single larceny rule, on which Mr. Rasabout relies. Third, we hold that the state and federal cruel and unusual punishment clauses are inapplicable *1262 because those clauses deal with punishment, which is distinct from the allowable unit of prosecution for an offense.
I. MR. RASABOUT WAS PROPERLY CONVICTED OF TWELVE COUNTS OF UNLAWFUL DISCHARGE OF A FIREARM BECAUSE HE FIRED TWELVE DISCRETE SHOTS
T7 At the heart of this case is a single question: What is the allowable unit of prosecution for the crime of unlawful discharge of a firearm? The answer to that question determines whether Mr. Rasabout was permissibly convicted of twelve counts. The court of appeals concluded that "the unit of prosecution under the firearm discharge statute is each discrete shot."[4] Mr. Rasa-bout argues that this conclusion was in error. He points instead to the intent required by the enhancement provision and argues that the allowable unit of prosecution is the continuous intent that motivates one or more shots. He reasons that he violated the statute only onee because a single continuous intent motivated him to fire all twelve shots. The State disagrees, arguing that the Legislature criminalized each discrete shot. We agree with the State and therefore affirm the court of appeals.
A. Identifying the Allowable Unit of Prosecution for an Offense
T8 The allowable unit of prosecution for an offense determines whether a perpetrator's conduct constitutes one or more violations of that offense. Take the example of child pornography. It is a crime to "intentionally ... view[ ] child pornography." [5] If a perpetrator views multiple images of multiple victims over a period of time, how many times has he committed the offense? Perhaps there is one violation for each viewing session, regardless of the number of images or victims. Or maybe there is one violation for each victim or one for each image. The allowable unit of prosecution provided by the offense resolves this question. In the case of child pornography, the Legislature has provided that "[i]t is a separate offense under this section: (a) for each minor depicted in the child pornography; and (b) for each time the same minor is depicted in different child pornography." [6]
T9 But not all statutes explicitly define the allowable unit of prosecution. State v. Morrison, which dealt with a prior version of the child-pornography statute, illustrates the appropriate analysis when the statute at issue is not so explicit.[7] In that case, the defendant contended that he violated the child-pornography statute only once even though he possessed multiple visual representations of child pornography.[8] Although the statute did not explicitly define the allowable unit of prosecution, we nevertheless focused on the statutory language that defined the offense as " 'knowingly ... possess[ing] ... material . depicting'" child pornography and defined "material" as "'any visual representation'"[9] We reasoned that "[the clearest reading of the statute is that each individual 'visual representation' of child pornography that is knowingly possessed by a defendant constitutes the basis for a separate offense." [10] Accordingly, on the basis of the statutory language, we held that the allowable unit of prosecution for child pomogla-phy is each visual representation.[11]
110 In short, identifying the allowable unit of prosecution for an offense is a question of statutory construction.[12] And *1263 when construing a statute, we seek to give effect to the intent of the Legislature.[13] Indeed, this has been our practice from the time of statehood until now.[14] To ascertain that intent, we look first to the text of the statute within its context.[15] And while the ordinary meaning of a word is powerful evidence in understanding statutory text, it is not the only consideration because it is simply inconclusive as to the meaning intended in a particular context.[16] Even if a word bears one meaning in the majority of cases where that word is used proximate to another, that does not foreclose the possibility that the Legislature intended a less-preferred meaning in a particular context,. We therefore begin with the plain language of the provision at issue in our broader effort to ascertain the intent of the Legislature disclosed by the language of the act as a whole, the act's operation, and its purpose.
B. The Allowable Unit of Prosecution for. Unlawful Discharge of a Firearm is Bach Discrete Shot
11. The unlawful-discharge-of-a-firearm statute provides that "[a] person may not discharge any kind of dangerous weapon or firearm". in certain dangerous conditions."[17] The allowable unit of prosecution turns on the meaning of the term "discharge" in the context of a "dangerous weapon or firearm."
wcharge in a firearm . 4 12 The word discharge is made up of two parts: a prefix and the root word. Adding the prefix dis provides the negative or opposite meaning of the root word.[18] The root word charge includes the verb meaning "to place a charge (as of powder) in" and the noun meaning "the quantity of explosive used in a single discharge." [19] And the dictionary entry of the word discharge includes the meaning "to release from confinement" or simply to shoot.[20] The definition of shoot confirms its synonymous meaning in the firearm context; it means "to eject or impel ... by a sudden release of tension" or "to drive forth ... by an explosion (as of a powder ..)"[21] Under these dictionary entries, the clearest reading of the statute is that discharging a weapon or firearm means shooting a weapon or firearm.
{13 This understanding is confirmed by the statutory definition applicable to this offense. It defines a firearm as "any device *1264 ... from which is expelled a projectile by action of an explosive." [22] In other words, it contemplates the expulsion of a single projectile with a single explosion, Similarly, that section defines a handgun as a "firearm of any description ... from which any shot, bullet, or other missile can be discharged, the length of which ... does not exceed 12 inches." [23] This definition also contemplates a single "shot, bullet, or other missile" that "can be discharged."[24] These definitions thus confirm that the term discharge contemplates a discrete shot or explosion."[25]
€ 14 Additionally, it was reasonable for the Legislature to criminalize each shot fired because each shot carries an independent harm. Otherwise, an individual shooting once would have no punitive deterrent from continuing to shoot as many times as possible-essentially a buy one, harm as much as you like discount, Thus, convicting Mr, Ras-about of a separate offense for each shot fired creates an independent punitive deterrent for each pull of the trigger.
€ 15 In urging his position that the allowable unit of prosecution is not each shot fired, Mr. Rasabout points to the "intent to intimidate" language in subsection (2) of the statute. He argues that this language suggests that the Legislature defined the allowable unit of prosecution for this offense based on the singular intent of the perpetrator, no matter haw many shots are actually fired. We are unpersuaded by Mr., Rasabout's argument for two reasons. First, the "intent to intimidate" language is not part of the provision defining the crime. Rather, it is located in the enhancement provision. Because we presume that the Legislature used the term discharge consistently throughout the statute, it must mean the same thing whether or not the offense is enhanced. Because the word discharge means shoot in the provision defining the crime, it must mean the same thing when the perpetrator discharges a firearm with an "intent to intimidate." Second, there is nothing about an "intent to intimidate" as an enhancement that suggests that the intimidation super-cedes the flying bullet as the principal harm that the Legislature sought to criminalize. Just as each flying bullet is dangerous, so too is each flying bullet that was fired with the intent to intimidate. Accordingly, the allowable unit of prosecution for the unlawful-discharge-of-a-firearm statute under which Mr. Rasabout was convicted is each discrete shot, whether or not the shot is fired with a mens rea that enhances the classification of the offense.
C. Sua Sponte Corpus Linguistics Research is Not Appropriate
T16 Justice Lee charges the court with coming to this conclusion by plucking a definition from a dictionary on the basis of cloaked intuition.[26] Instead, he advances what he deems a "more transparent" interpretation methodology that utilizes corpus linguistics research.[27] We decline to adopt his approach because, among other reasons, it is unfair to the parties and it attempts scientific research that is not subject to scientific review,
T17 To begin, Justice Lee argues that we should decide this case against Mr. Rasabout on the basis of the corpus linguistics research he has conducted sua sponte. But because his rationale is so different in kind from any argument made by the parties, Mr. Rasabout has never had a reasonable opportunity to present a different perspective, This violates the very notion of our adversary sys *1265 tem, which "assures fairness by exempting a party from the inequity of [losing] on appeal on a ground that [he] had no opportunity to address." [28][Wle should not dilute [the protections of our adversary system] by stretching their standards to justify our consideration of [an argument] we find interesting or important." [29] Moreover, deciding this case on the basis of an argument not subjected to adversarial briefing is a recipe for making bad law.[30]
18 Additionally, it would be entirely inappropriate for this court to conduct the independent scientific research that serves as the basis for Justice Lee's approach. Justice Lee admits that he is not an expert in this field and does not completely understand its methodologies, but asserts that we must "try." [31] Linguistics is a scientific field of study that uses empirical research to draw findings.[32] And just as with other fields of scientific study, simply trying harder will not lead us to a better answer. The knowledge and expertise required to conduct scientific research are "usually not within the common knowledge" of judges, so "testimony from relevant experts is generally required in order to ensure that [Judges] have adequate knowledge upon which to base their decisions." [33] We regularly refuse to conduct legal research, a field in which we are experts.[34] We should similarly refuse our inclination to contrive of interesting research projects that require expertise in fields in which we have no training.
119 Moreover, as Justice Lee points out, "[mljost judges are generalists." [35] Indeed, we are aware of almost no one sitting on the bench or practicing law in this state who has the kind of scientific expertise required to reliably conduct the research Justice Lee requires. And issues of statutory construction where "both sides are able to marshal dictionary definitions in support of their view permeate the majority of cases in this state.[36] But in every such case, Justice Lee would require ad hoe linguistics research that could only be reliably conducted by dueling linguisties experts. Imposing such a significant financial burden on so many of the litigants coming through the doors of our courts would be tantamount to locking those doors for all but the most affluent. Moreover, it would place an unbearable burden upon our already thinly stretched district judges. That is simply unacceptable.
120 Justice Lee's appeal to linguistics research would not be so disquieting if he were not conducting the research himself, but merely citing findings that have been advanced by the parties, published in a scholarly journal, or authored by a respected source. Such sources include the reports of expert witnesses, published academic articles, and widely available dictionaries. In those cases, findings are subject to review by the relevant field of study or the opposing party's expert before we rely upon them. But if we conduct our own research, the parties are bound by our decision even if our methods or findings *1266 are subsequently found to be flawed. Accordingly, it is unfair, and indeed unwise, for us to decide a case on the basis of scientific research that is subject to neither prior review by the relevant field of study or adversarial briefing.
T21 We are not experts in this field and accordingly have no intention of meeting Justice Lee on the merits of his research. But there are at least a few questions that -are immediately apparent with regard to 'his methodology. To begin, of the eighty-six "hits" Justice Lee found with his search, he simply ignores thirty-six as having "insufficient detail to indicate whether the discharge at issue had reference to a single shot or the emptying of a magazine." [37] And thirty-one of the remaining hits required an interpretive assumption or were "a bit more ambiguous." [38] So many apparently neutral or ques- ' tionable data points raise the question of whether the trend that Justice Lee draws from the data is statistically insignificant "the figures extracted from the data are simply the result of random chance, and do not indicate what they seem to indicate." [39] It certainly calls into question his claim, that "discharge of a weapon is used overwhelmingly in the single shot sense." [40] Additionally, the data set on which Justice Lee relies "contains more than 410 million words of text and is equally divided among spoken, fiction, popular magazines, newspapers, and academic texts. " [41] The point of a large data set is to avoid " 'basing conclusions on a few speakers' idiosynerasies'" [42] But the "idiosyncrasies" of the Utah Legislature constitute the rule of law in this state. And the only way to identify those idiosyncrasies is through the text of the Utah Code, which is wholly absent from Justice Lee's data set. Apparently, there is no statutory or legal text of any kind in the data set. According ly, in an attempt to eschew the influence of any one speaker, Justice Lee's data set ignores the only speaker that matters. These are just two of the many questions raised by Justice Lee's methodology. And we have no doubt that more would surface if his methodology were subject to adversarial briefing or review by an expert in this field.
D. The Rule of Lenity Does Not Apply Because the Statute Is '_ Not Ambiguous
122 Mr. Rasabout. argues that we should use the rule of lenity to find in his favor. The rule of lenity requires that we interpret an ambiguous statute in favor of lenity toward the person charged with erimi-nal wrongdoing.[43] Thus, in the context of determining the allowable unit of prosecution under an ambiguous criminal statute, "doubt [must] be resolved against turning a single transaction into multiple offenses." [44] But as both parties agree, the rule of lenity is not implicated unless a statute is ambiguous. A statute is ambiguous when "its terms remain susceptible to two or more reasonable interpretations after we have conducted a plain language analysis.[45] ** In this case, we have conducted a plain language analysis and concluded that there is only one reasonable interpretation of the statute at issue. Accordingly, the rule of lenity is not implicated here.
*1267 123 Nevertheless, we take this opportunity to vacate the erroneous conclusion of the court of appeals with respect to the rule of lenity. The court of appeals held that the rule of lenity has been abrogated by the strict construction statute, Utah Code section 76-1-106.[46] It reasoned that the statute may permissibly abrogate the rule of lenity because "the rule is one of statutory construction, not constitutional law.[47] ¢" The State defends this reasoning on appeal. Mr. Rasa-bout argues that the rule of lenity cannot be abrogated by statute because it is based in due process. We agree.
$24 The United States Supreme Court has held that the rule of lenity "is rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited." [48] The reasoning behind the Court's holding is simple An ambiguous statute violates the notice requirement of due process because it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." [49] The Due Process Clause of the Utah Constitution provides an alternative basis for the same protection.[50] That provision "dofes] not permit enforcement of a statute that forbids an act in terms so vague that [persons] of common intelligence must necessarily guess at [the statute's] meaning and differ as to its application." [51] Thus, the rule of lenity is dictated by the notice protection afforded: by both federal and state due process. Accordingly, insofar as the strict construction statute purports to abolish the rule of lenity, we hold that it does not.
E. Mr. Rasabout's Twelve Convictions Do Not Violate the Rule Against Multiplicity Under the Double Jeopardy Clause of the United States Constitution
Mr. Rasabout contends he committed only one offense and accordingly the State cannot punish him for twelve counts without violating the rule against multiplicity, which arises from the Double Jeopardy Clause of the United States Constitution."[52] We disagree.
126 The Double Jeopardy Clause protects a defendant from "being] twice put in jeopardy" "for the same offence."[53] From this protection springs the rule against multiplicity, which prohibits " 'multiple punishments for the same offense.'" [54] The rule against multiplicity is violated if the State punishes a defendant for more counts of an offense than are allowed by the intended unit of prosecution for that offense."[55] But it is not implicated in determining the allowable *1268 unit of prosecution for an offense or when the state charges a defendant with multiple violations consistent with the statutorily defined unit of prosecution.
127 In this case, Mr. Rasabout was convicted of twelve separate counts of unlawful discharge of a firearm on the basis of twelve discrete shots. Because the allowable unit of prosecution for that offense is each discrete shot, the State may charge and punish Mr. Rasabout for twelve counts without implicating Mr. Rasabout's Fifth Amendment rights.
IL THE SINGLE CRIMINAL EPISODE STATUTE AND THE SINGLE LARCENY RULE ARE INAPPLICABLE
128 In merging Mr. Rasabout's twelve convictions, the trial court relied on the single criminal episode statute, Utah Code seetion 76-1-401, and a case applying the single larceny rule. Mr. Rasabout urges us to adopt its reasoning. We conclude that neither the single criminal episode statute nor the single larceny rule apply here.
129 First, the single criminal episode statute, Utah Code section 76-1-401, is inapplicable because it does not dictate the merger of offenses. While this section provides that a " 'single criminal episode' means all conduct which is closely related in time and is incident to an attempt or an accomplishment of a single criminal objective," there is nothing in this or the operative sections that follow mandating that a court merge offenses committed within a single criminal episode.[56] To the contrary, subsection (1) of section 76-1-402 specifically provides that "[a] defendant may be prosecuted in a single criminal action for all separate offenses arising out of a single criminal episode." [57] And subsection (2) explicitly accounts for a situation when "conduct may establish separate offenses under a single criminal episode." [58] Additionally, while the operative sections provide specific double-jeopardy-like protections, such as protecting a defendant from being "subject to separate trials for multiple offenses," being "convicted of both the offense charged and [an] included offense," and being "punished [for the same act] in different ways under different provisions of [the] code," [59] none of these concerns are implicated in this case. Mr. Rasabout was convicted in a single trial of twelve separate counts of violating a single offense. Thus, the trial court's reliance on section 76-1-401 for merging Mr. Rasabout's convictions was misplaced.
130 The single larceny rule is also inapplicable here because this case does not involve larceny.[60] The single larceny rule governs the aggregation of multiple thefts over a period of time when the statutory text does not otherwise provide an allowable unit of prosecution.[61] In the context of theft, a statutory descendent of common law larceny, we have held that "'if there is but one intention, one general impulse, and one plan, even though there is a series of transactions, there is but one offense"" [62] This doctrine was developed in the context of common law larceny and has been extended to larceny's statutory progeny in this state, including theft and robbery.[63] But Mr. Rasabout has failed to provide us with a rationale for extending this common law doctrine outside the *1269 realm of larceny and into a statutory scheme that independently defines the allowable unit of prosecution.
1 31 In sum, we hold that the single erimi-nal episode statute is inapplicable because Mr. Rasabout was convicted of twelve counts of a single statutory offense in a single trial. And we hold that the single larceny rule is inapplicable because this case is governed by the allowable unit of prosecution defined by the Legislature in the statute criminalizing unlawful discharge of a firearm.
III. CRUEL AND UNUSUAL PUNISHMENT IS NOT IMPLICATED IN DETERMINING THE ALLOWABLE UNIT OF PROSECUTION FOR AN OFFENSE
132 Mr. Rasabout finally argues that defining the allowable unit of prosecution as each discrete shot may result in a sentence that is cruel and unusual in violation of the United States Constitution and the Utah Constitution. The State argues that this issue is not implicated here. We agree with the State because this appeal raises only the allowable unit of prosecution, an issue that is distinct from punishment.
1383 Both the United States Constitution and the Utah Constitution prohibit eruel and unusual punishment.[64] But these protections are a constitutional backstop to the overall punishment imposed for criminal conduct; they do not dictate the allowable unit of prosecution.[65] In this case, the question is how many convictions are permissible. On remand, the trial court will determine the appropriate punishment for Mr. Rasabout's criminal conduct. While the number of convictions will be one factor in that determination, the trial court will consider numerous other factors. It is at that point that Mr. Rasabout may challenge the total sentence as crael and unusual.
134 In sum, we hold that the question of cruel and unusual punishment is not implicated in a determination of the allowable unit of prosecution for an offense.
CONCLUSION
185 Mr. Rasabout fired twelve shots at a house he knew to be occupied by a rival gang member. A jury convicted him of twelve counts of unlawful discharge of a firearm, in violation of Utah Code section 76-10-508. That was permissible because each shot fired was a separate discharge under the statute. We accordingly affirm the court of appeals and remand this case for further proceedings consistent with this opinion.
DURRANT, C.J., concurring in part and concurring in the judgment.

. State v. Rasabout, 2013 UT App 71, ¶ 33, 299 P.3d 625.

. State v. Levin, 2006 UT 50, ¶15, 144 P.3d 1096.

. Urar Cope § 76-10-508 (2007).

, State v. Rasabout, 2013 UT App 71, ¶ 33, 299 P.3d 625.

. Cope § 76-5b-201(1)(a)@1). yt

. Id. § 76-5b-201(3). p

. 2001 UT 73, 14 24-26, 31 P.3d 547. N

. Id. 1 24. mo

. Id. 25 (alterations in original).

. Id.126.

, Id.

. Id. 25-26; see also Bell v. United States, 349 U.S. 81, 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955) (When determining how many times a federal offense has been committed, courts must determine "[what Congress has made the allowable unit of prosecution." (internal quotation marks omitted)); 41 AmJur2p Indictments and Informations § 205 (2015) ("[Wlhen the same statutory violation is charged twice, the question is whether [the Legislature] has intended the facts underlying each count to make up a separate unit of prosecution."); 42 C.J.S. Indictments § 213 (2015) (A court must "consider{] whether the legislature intended the facts underlying each *1263 count to make up a separate unit of prosecution.").

, LPI Servs. v. McGee, 2009 UT 41, ¶ 11, 215 P.3d 135.

. See, e.g., Delta Canal Co. v. Frank Vincent Family Ranch, LC, 2013 UT 69, ¶ 16, - P.3d -; Anderson v. United Parcel Serv., 2004 UT 57, 124, 96 P.3d 903; Savage Indus., Inc. v. Utah State Tas Comm'n, 811 P.2d 664, 671 (Utah 1991); Wells Fargo Armored Serv. Corp. v. Pub. Serv. Comm'n of Utah, 626 P.2d 450, 451 (Utah 1981); Scott v. Sch. Bd. of Granite Sch. Dist., 568 P.2d 746, 747-48 (Utah 1977); Walker Bank & Trust Co. v. Taylor, 15 Utah 2d 234, 390 P.2d 592, 594 (1964); Donahue v. Warner Bros. Pictures Distrib. Corp., 2 Utah 2d 256, 272 P.2d 177, 183 (1954); Norville v. State Tax Comm'n, 98 Utah 170, 97 P.2d 937, 939 (1940); Moormeister v. Dep't of Registration of State, 76 Utah 146, 288 P. 900, 903 (1930); Roberts v. Lynch, 56 Utah 346, 190 P. 930, 932 (1920); Hayes v. Ross, 41 Utah 580, 127 P. 340, 343 (1912); Armstrong v. Johnson (In re Owens' Estate), 30 Utah 351, 85 P. 277, 279 (1906); Pratt v. Bd. of Police & Fire Comm'rs, 15 Utah 1, 49 P. 747, 749 (1897).

, LPI Servs., 2009 UT 41, ¶ 11, 215 P.3d 135.

, While some of our cases focus on ordinary meaning, they should not be read to suggest that ordinary meaning is the exclusive tool available to us in our effort to effectuate legislative intent when a statutory term is not expressly defined or does not appear to be a technical term of art. E.g., Barneck v. Utah Dep't of Transp., 2015 UT 50, ¶28, 353 P.3d 140; State v. Bagnes, 2014 UT 4, ¶ 13, 322 P.3d 719; Hi-Country Prop. Rights Grp. v. Emmer, 2013 UT 33, ¶18, 304 P.3d 851; State v. Canton, 2013 UT 44, ¶¶ 10-27 & n. 6, 308 P.3d 517; Olsen v. Eagle Mountain City, 2011 UT 10, ¶ 9, 248 P.3d 465.

. Urag Cope § 76-10-508(1)(a) (2007) (emphasis added).

. Merriam-Wesster's Corcecrare Dictionary 354 (11th ed.2012).

. Id. at 208.

, Id. at 356 (equating discharge with shoot as in [discharge] an arrow"); see also id. at 471 (defining firearm as "a weapon from which a shot is discharged by gunpowder"); THs American Hert Tace Dictionary or tE Enouse Lancuace 514 (5th ed. 2011) ("The musket discharged loudly." (emphasis omitted)).

. Merrtam-Wesster, supra, at 1151; American Herimace, supra, at 1620 (defining shoot as "(tlo fire or let fly (a missile) from .a weapon" or "(tlo discharge (a weapon)").

. Ura Cope § 76-10-501(9) (2007) (emphasis added).

. Id. § 76-10-501(12).

. Id.

. Mr. Rasabout points out that a shotgun expels multiple pellets with a single explosion,. But we are not persuaded that this is a distinction with a meaningful difference. The statutory definition of firearm equates a shotgun with a pistol and a rifle, all of which use a single explosion to expel a projectile. Id. § 76-10-501(9). The fact that a cartridge of ammunition includes multiple pellets does not change the fact that it is a single shot. Mr. Rasabout also points to the case of an automatic weapon. But a fully automatic weapon is a "firearm which fires ... automatically more than one shot without manual reloading by a single function of the trigger." Id. § 76-10-501(11). Even though there is only "a single function of the trigger," there are still multiple shots.

. Infra 153.

. Infra T55.

. R.C.S. v. A.O.L. (In re Baby Girl T.), 2012 UT 78, ¶ 42, 298 P.3d 1251 (Lee, J., dissenting).

. Id.¶ 56.

. See, e.g., St. Jeor v. Kerr Corp., 2015 UT 49, ¶ 14, 353 P.3d 137 (noting that "we would be ill-advised to reach a decision regarding unsettled law without the benefit of adversarial briefing" (internal quotation marks omitted)); Munson v. Chamberlain, 2007 UT 91, ¶ 21, 173 P.3d 848 (overruling the last paragraph of a previous opinion because in deciding that issue ""we were not able to benefit from any adversarial briefing").

. See infra M 107, 113, 116 (internal quotation marks omitted).

. See infra 158 (citing Tony McrnEry & Anprew Harpe, Corpus Lincuistics: Metron, Tegory Axnp Practice (2012), which notes that "the combination of falsifiability and replication can make us increasingly confident in the validity of corpus linguistics as an empirical, scientific enterprise," id. at 46); infra (noting that corpus linguistics "is not rocket science," but is instead "like math"); What is Linguistics?, Lincuistic So-ciery or America, http://www.linguisticsociety.org./ what-linguistics (last visited July 10, 2015) ("Linguistics, in a nutshell, is the scientific study of language."); Linguistics MA, BricHiam Youne Unt versity, http;//linguistics.byu.edu/linguistics/ma/ (last visited July 10, 2015) (defining linguistics as "the scientific study of language").

. Bowman v. Kalm, 2008 UT 9, ¶ 7, 179 P.3d 754.

. See, e.g., Judson v. Wheeler RV Las Vegas, LLC., 2012 UT 6, ¶ 20 n. 9, 270 P.3d 456.

. Infra ¶¶ 107, 113.

. Infra % 70.

. Infra 490.

. Infra % 89.

. McBEnery & Harpim, supra, at 251 (defining "statistical significance," noting that "statistical procedures [are] used to test statistical significance," and also defining a "significance test" as "(al mathematical procedure to determine whether a result is statistically significant" (first and second emphasis added)); Doveras Biser rr aL, Corpus Lincuisrics: Investication Lancuace Structure anp Use 275 (2004) (discussing "[slignifi-cance tests and the reporting of statistics").

. Infra 192.

, Infra 484.

. Infra 54 n. 10 (quoting Breer et al., supra, at 3).

. State v. Watkins, 2013 UT 28, ¶ 38 n. 3, 309 P.3d 209 ("'The rule of lenity applies when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute and prescribes the narrow construction of ambiguous penal laws against the state." (internal quotation marks and citations omitted)).

. Bell, 349 U.S. at 84, 75 S.Ct. 620; 42 CJ.S. Indictments § 213 (2015) ("Any doubt as to [the intended unit of prosecution] is resolved in favor of lenity for the defendant.").

. Watkins, 2013 UT 28, ¶ 24, 309 P.3d 209.

. Rasabout, 2013 UT App 71, ¶¶ 29-32, 299 P.3d 625; Urax Cops § 76-1-106 ("The rule that a penal statute is to be strictly construed shall not apply to this code, any of its provisions, or any offense defined by the laws of this state. All provisions of this code and offenses defined by the laws of this state shall be construed according to the fair import of their terms to promote justice and to effect the objects of the law and general purposes of Section 76-1-104.").

. Rasabout, 2013 UT App 71, ¶ 30, 299 P.3d 625.

. Dunn v. United States, 442 U.S. 100, 112, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979); see also United States v. Lanier, 520 U.S. 259, 266, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) ("[The canon of strict construction of criminal statutes, or rule of lenity, ensures fair warningl, as required by due process,] by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered.").

. United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954),

. Trax Const art. L § 7.

. State v. Mooney, 2004 UT 49, ¶ 17, 98 P.3d 420 (second and third alterations in original) (internal quotation marks omitted).

. Mr. Rasabout also asserts a double jeopardy 'claim under the Utah Constitution, but we decline to reach it because he failed to adequately differentiate this claim from its federal counterpart. We will not reach a state constitutional argument unless it is distinctly raised and adequately briefed. State v. Tiedemann, 2007 UT 49, ¶¶ 32-38, 162 P.3d 1106. There is no "formula ... for adequate framing and briefing of state constitutional issues," but a clearly raised and differentiated argument will likely include a separate section of analysis that begins with the text of the state constitutional provision. Id. 137.

. U.S. Const amend. V.

. State v. Prion, 2012 UT 15, ¶ 30, 274 P.3d 919 (quoting North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969)).

. Morrison, 2001 UT 73, ¶¶ 24-26, 31 P.3d 547.

. Cope § 76-1-401; see id. §§ 76-1-402 to -405,

. Id. § 76-1-402(1) (emphasis added).

. Id. § 76-1-402(2) (emphasis added).

. Id. § 76-1~402.

. The trial court cited State v. Irvin, 2007 UT App 319, ¶¶ 14-21, 169 P.3d 798, an opinion from the court of appeals that cites our opinion in State v. Crosby, 927 P.2d 638, 645 (Utah 1996). These opinions apply the single larceny rule. They also cite the single criminal episode statute for support. While the single larceny rule, the Double Jeopardy Clause, and the single criminal episode statute often operate in proximity to one another, they are nevertheless distinct. When litigants and courts mingle them, as has been done in this case, it muddies the legal analysis.

. Irvin, 2007 UT App 319, ¶¶ 14-21, 169 P.3d 798; Crosby, 927 P.2d at 645-46.

. Crosby, 927 P.2d at 645 (quoting State v. Kimbel, 620 P.2d 515, 518 (Utah 1980)).

. See United States v. Sydnor, 12 Fed.Appx. 141, 142 (4th Cir.2001) (noting the common law origin of the single larceny rule and collecting cases that have applied it); Crosby, 927 P.2d at 645-46 (applying the single larceny rule to theft); Irvin, 2007 UT App 319, ¶¶ 14-21, 169 P.3d 798 (applying the single larceny rule to aggravated robbery).

. U.S. Const. amend. VIII; Urax Const art. I, § 9.

. Ex parte Hawkins, 6 S.W.3d 554, 557 n. 8 (Tex.Crim.App.1999) ("'The Eighth Amendment's Cruel and Unusual Punishment Clause might impose limits on the total amount of punishment that can be heaped upon a person for a single 'act' or series of acts, but the Double Jeopardy Clause imposes no limits on how the legislature may carve up conduct into discrete legal offense units.'" (quoting Akhil Reed Amar, Double Jeopardy Law Made Simple, 106 Yar LJ. 1807, 1818 (1997))).