**2023 UT App 106**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellant,
*v.*
OUSMANE CAMARA,
Appellee.

Opinion
No. 20210668-CA
Filed September 21, 2023

Third District Court, Salt Lake Department
The Honorable Chelsea Koch
No. 181909526

Sean D. Reyes, John J. Nielsen, and
Natalie M. Edmundson, Attorneys for Appellant

Erick Grange, Attorney for Appellee

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS concurred.

OLIVER, Judge:

¶1 A jury convicted Ousmane Camara of first-degree aggravated kidnapping and second-degree assault with substantial bodily injury. Before sentencing, Camara moved to arrest judgment on the aggravated kidnapping conviction, arguing the evidence was insufficient to prove the predicate offense of kidnapping and the conviction should therefore be entered as a third-degree felony instead. The district court granted the motion, concluding the State failed to prove the victim was detained or restrained in circumstances exposing her to "risk of bodily injury," and therefore entered the aggravated kidnapping conviction as a third-degree felony. The State appeals the grant of Camara's motion to arrest judgment. We conclude the evidence was sufficient to support the jury's verdict of kidnapping based

on the risk of bodily injury. We therefore reverse the grant of the motion to arrest judgment and remand the matter with instruction to reinstate the jury's verdict.

BACKGROUND[1]

¶2 On September 6, 2018, at approximately 10:00 p.m., Ruby,[2] a woman unknown to Camara, was walking down a sidewalk on Redwood Road in Salt Lake City when Camara approached her from behind. Ruby turned around, and Camara hit her in the face, causing her to fall to the ground. Camara made a lewd comment, grabbed Ruby's arm, and proceeded to drag her across five lanes of traffic on Redwood Road. Ruby struggled to get away from Camara—who told her he had a gun—because she was afraid of what he would do to her once they had crossed the road.

¶3 When Camara and Ruby reached the other side of the road, several bystanders pulled Camara away and encircled Ruby to prevent Camara from continuing to punch her. Camara ran into a nearby business, where he was quickly located by responding police officers and taken into custody. Ruby was transported to the hospital, where she received stitches for lacerations on her chin and above her eye. She was also diagnosed with a broken jaw that required surgery to repair.

¶4 Camara was charged with first-degree aggravated kidnapping and second-degree aggravated assault resulting in serious bodily injury. He filed several pretrial motions

---

1. "We recite the facts in the light most favorable to the jury's verdict, and we present conflicting evidence as necessary to understand issues raised on appeal." *State v. Black*, 2015 UT App 30, ¶ 2, 344 P.3d 644.

2. A pseudonym.

challenging the first-degree aggravated kidnapping charge, all of which the district court denied.

¶5 At trial, Ruby testified she was walking home from work along Redwood Road between 9:30 and 10:00 p.m. when Camara "attacked" her. According to Ruby, the night was dark but there were "a few" streetlights illuminating Redwood Road. As to the traffic on Redwood Road at the time, Ruby estimated that "at least" twenty cars passed by in the time it took her to walk approximately one-half mile. Ruby testified it took Camara approximately two or three minutes to drag her across Redwood Road because he stopped several times to let vehicles pass. Ruby also testified she was "trying to get away from" Camara as he dragged her and was "hoping" she would get hit by a car because she "didn't know what his intention was" with her.

¶6 The detective who investigated the incident (Detective) testified. He described the stretch of Redwood Road where Camara dragged Ruby as having four lanes of traffic and a middle turning lane. Detective estimated that each lane is approximately thirty-five feet wide. There are no crosswalks in the area where the incident occurred. According to Detective, the speed limit is forty-five miles per hour and vehicles ordinarily travel at that speed. Detective told the jury he had responded to "dozens" of motor vehicle accidents on Redwood Road over the previous six-year period and, based on his experience, opined that a pedestrian hit by a car traveling forty-five miles per hour would suffer "pretty serious" and possibly "fatal" injuries.

¶7 A Salt Lake City Police patrol officer (Officer 1) described Redwood Road as "a very busy road" with steady traffic "even at 10:00 at night." Officer 1 testified there were vehicles traveling on Redwood Road when he responded to the incident involving Camara and Ruby and "you could hear the traffic going by."

¶8 The State also presented the testimony of another Salt Lake City Police patrol officer who responded to the incident (Officer

2). Officer 2 testified he routinely patrols the area around Redwood Road and normally begins his shift at 9:30 p.m. He stated "there is still a fair amount of traffic" on Redwood Road around 10:00 p.m. Officer 2 described the portion of Redwood Road that Camara dragged Ruby across as having four travel lanes, two in each direction, and a left-turn lane accessible to drivers traveling in either direction. When asked about Camara's demeanor on the night of the incident, Officer 2 stated Camara's behavior—which included "yelling," "pretending to sleep," and not responding to any questions—was consistent with someone under the influence of narcotics.

¶9     A witness to the assault (Witness) also testified. Witness stated he observed Ruby screaming for help as Camara dragged her in front of a business located along Redwood Road. When Witness told Camara to release Ruby, Camara punched her again and said, "She is not a human. She is a robot."

¶10     After the State rested, Camara moved for a directed verdict on the aggravated kidnapping charge, arguing Ruby was not exposed to a risk of bodily injury when Camara dragged her across Redwood Road because he continually stopped to avoid the vehicles traveling on the road. The district court denied the motion. The jury returned a guilty verdict on both the aggravated assault and aggravated kidnapping charges.

¶11     Before Camara was sentenced, he moved to arrest judgment on the aggravated kidnapping conviction, asking the court to reduce the severity of the charge from a first-degree felony to a third-degree felony. This time the district court granted the motion, concluding the State's evidence was sufficient to prove that Camara unlawfully detained Ruby while dragging her across Redwood Road but insufficient to prove she was exposed to risk of bodily injury separate from the inherent risk of injury from the continued assault. According to the court, "no reasonable jury could have found, beyond a reasonable doubt,

that the act of dragging [Ruby] across the street for two to three minutes exposed her to risk of bodily injury from the passing cars . . . when [Ruby] specifically testified that [Camara] stopped for cars, let them pass, and then proceeded to cross the street after the cars had passed." Because the jury had been separately instructed on aggravated kidnapping based on unlawful detention, the district court entered the aggravated kidnapping conviction as a third-degree felony rather than as a first-degree felony.

## ISSUE AND STANDARD OF REVIEW

¶12 The State challenges the district court's grant of Camara's motion to arrest judgment, asserting that the evidence was sufficient to show a risk of bodily injury. A district court "may arrest a jury verdict when the evidence, viewed in the light most favorable to the verdict, is so inconclusive or so inherently improbable as to an element of the crime that reasonable minds must have entertained a reasonable doubt as to that element." *State v. Bolson*, 2007 UT App 268, ¶ 10, 167 P.3d 539 (cleaned up). "A district court's determination that the evidence presented at trial is not legally sufficient to establish the offense charged is a legal determination, which we review for correctness." *State v. Black*, 2015 UT App 30, ¶ 13, 344 P.3d 644 (cleaned up).

## ANALYSIS

### I. Jurisdiction

¶13 Before we can proceed to the substantive arguments made by the State, we first address Camara's assertion that this court lacks jurisdiction to review the grant of his motion to arrest judgment. The law on whether the State can appeal from orders arresting judgment is well-settled. The Utah Legislature has expressly conferred appellate jurisdiction in cases involving the entry of an order arresting judgment. Utah Code § 77-18a-1(3)(d)

("The prosecution may, as a matter of right, appeal from . . . an order arresting judgment . . . ."). According to Camara, however, the district court's ruling, although denominated as an arrest of judgment, was actually an acquittal because the court concluded the evidence was insufficient to show Ruby was exposed to risk of bodily injury. He relies on Utah Code section 76-1-403, the Utah statute governing double jeopardy,[3] which provides that "[t]here is an acquittal if the prosecution resulted in a finding of not guilty by the trier of facts or in a determination that there was insufficient evidence to warrant conviction." *Id.* § 76-1-403(2). And the State, he argues, cannot appeal from an acquittal. *See State v. Willard*, 801 P.2d 189, 191–92 (Utah Ct. App. 1990) (dismissing the State's appeal from a ruling of the trial court that was "in substance, an acquittal").

¶14    Camara's assertion that he was acquitted is directly contrary to decades-old precedent. In 1992, this court rejected an argument nearly identical to Camara's, acknowledging the

---

3. Under our double-jeopardy statute, "a criminal defendant is protected from subsequent prosecutions for the same criminal act after acquittal." *State v. Cahoon*, 2009 UT 9, ¶ 16, 203 P.3d 957. The State's appeal, however, does not implicate statutory or constitutional double jeopardy. Our reversal of the grant of Camara's motion will not result in Camara being retried; instead, the jury's guilty verdict will simply be reinstated. *See State v. Musselman*, 667 P.2d 1061, 1065 n.2 (Utah 1983) ("If a jury verdict of guilty is set aside by an order of a trial judge pursuant to a motion in arrest of judgment, . . . that order may be appealed pursuant to [section] 77-35-26(c)(2), and if reversed, the guilty verdict reinstated."); *see also State v. Miller*, 747 P.2d 440, 444 (Utah Ct. App. 1987) ("The constitutional guarantee against double jeopardy affords a criminal defendant three separate protections by prohibiting: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense.").

language in section 76-1-403(2) but ruling that once a case is "submitted to a jury, only the jury may acquit the defendant." *State v. Larsen*, 834 P.2d 586, 589 (Utah Ct. App. 1992). This court distinguished between the actions of a district court taken before a jury verdict and those taken after, stating:

> In Utah, a judge may not acquit a defendant after a jury returns a guilty verdict. Utah rules provide that a judge may issue an order dismissing an information or indictment at the conclusion of the evidence by the prosecution, or at the conclusion of all the evidence, if the evidence is not legally sufficient to establish the offense charged therein or any lesser included offense. The rules also allow a judge to arrest judgment at any time prior to sentencing. There is no rule, however, that allows a judge, who is not the trier of fact, to acquit a defendant following a jury verdict of guilty.

*Id.* (cleaned up).

¶15 Relying on our supreme court's opinion in *State v. Musselman*, 667 P.2d 1061 (Utah 1983), Camara nevertheless argues the State cannot appeal an arrest of judgment if the basis of the court's ruling is that the State's evidence was insufficient to support the jury's verdict. In *Musselman*, our supreme court described an acquittal as a "ruling that constitutes a factual resolution in favor of the defendant on one or more of the elements of the offense charged." *Id.* at 1064. According to Camara, that is exactly what happened here. *Musselman*, however, involved a situation wholly unlike the one presented here. In that case, the defendant was "tried to the court sitting *without* a jury." *Id.* (emphasis added). After the trial court acquitted the defendant on two charges, the State appealed. *Id.* Our supreme court dismissed the State's appeal of those counts, concluding the trial court's ruling was an acquittal that was not appealable. *Id.* But our

supreme court has also held that Utah law permits the State to appeal a ruling arresting judgment after a jury's guilty verdict even if the ruling was based on the sufficiency of the State's evidence. *See State v. Workman*, 806 P.2d 1198, 1202 (Utah 1991). Even *Musselman* states that when a jury's guilty verdict is set aside by the trial court "pursuant to a motion in arrest of judgment," the court's order is appealable under Utah Code section 77-35-26(c)(2)"[4] and if reversed, the guilty verdict reinstated." 667 P.2d at 1065 n.2. That is precisely the situation here.

¶16 When the district court ruled in Camara's favor and granted his motion to arrest judgment on the first-degree aggravated kidnapping conviction, it did not render its own verdict in the first instance based on the sufficiency of the State's evidence. Instead, it set aside the jury's guilty verdict pursuant to a motion to arrest judgment. Thus, the district court's ruling was not an acquittal and this court has jurisdiction to address the State's appeal pursuant to Utah Code section 77–18a–1(3)(d).

## II. Risk of Bodily Injury

¶17 There is no dispute that the crime committed by Camara constitutes aggravated kidnapping because Utah law defines aggravated kidnapping as *either* kidnapping *or* unlawful detention, committed under aggravating circumstances. *See* Utah Code § 76-5-302(1)(a). The parties disagree only on whether the State's evidence was sufficient to prove the predicate crime of kidnapping or unlawful detention. The difference is significant because aggravated kidnapping based on kidnapping is a first-degree felony, *see id.* § 76-5-302(3)(b), whereas aggravated kidnapping based on unlawful detention is a third-degree felony *see id*. § 76-5-302(3)(a).

---

4. This statute was subsequently amended and renumbered as section 77-18a-1(3)(d). The provision for appealing an arrest of judgment remains unchanged.

¶18 Under the provisions of Utah law relevant here, kidnapping occurs when an "actor intentionally or knowingly, without authority of law, and against the will of an individual . . . detains or restrains the individual in circumstances exposing the individual to risk of bodily injury." *Id.* § 76-5-301(2)(b). Unlawful detention requires only that "the actor intentionally or knowingly, without authority of law, and against the will of an individual, detains or restrains the individual." *Id.* § 76-5-304(2)(a). Thus, the severity of the crime committed by Camara turns on whether the State proved that Ruby was exposed to risk of bodily injury.

¶19 Here, the evidence showed that Camara forcibly dragged Ruby, who was struggling to free herself, across a five-lane active road with a speed limit of forty-five miles per hour, at night, in an area not marked by a crosswalk. And the jury heard Detective's testimony that a pedestrian hit by a car going forty-five miles per hour would suffer "pretty serious" and possibly "fatal" injuries. The State argues that, under these circumstances, a reasonable jury could conclude beyond a reasonable doubt that there was a real or actual risk Ruby could have been struck by a vehicle and suffered bodily injuries. According to Camara, however, the evidence was insufficient to sustain his conviction because he "watched and waited for traffic to pass" as he dragged Ruby across the road. We agree with the State.

¶20 At oral argument, the State agreed with Camara that exposure to a mere hypothetical risk does not suffice and that the statute requires exposure to a "real" or "actual risk" as described in *State v. Gallegos*, 2007 UT 81, 171 P.3d 426. In *Gallegos*, our supreme court interpreted the term "expose" as used in the child endangerment statute to mean a "child must have a reasonable capacity to actually access or get to the [chemical] substance or [drug] paraphernalia or to be subject to its harmful effects, such as by inhalation or touching." *Id.* ¶ 11. In other words, showing a child images of drugs on television amounts to an entirely different type of exposure than allowing a child to be within arm's

length of the actual drugs. *See id.* ¶¶ 13–15 (explaining how exposure under the statute requires a child to be "in a situation where she is . . . near or accessible to anything that may affect her detrimentally" and not just "simply expos[ed] to the image of a controlled substance" (cleaned up)). *Gallegos*, then, is instructive as to the meaning of "exposing the individual to risk of bodily injury" in the kidnapping statute. *See* Utah Code § 76-5-301(2)(b).

¶21 Camara contends that there was no real or actual risk of bodily harm to Ruby because he waited for traffic to pass as they were proceeding across the road and no testimony at trial suggested they were almost hit by a vehicle.[5] But, while waiting for traffic may have mitigated the risk to both Ruby and Camara, based on the evidence presented, a reasonable jury could conclude beyond a reasonable doubt that Camara exposed Ruby to an actual risk of bodily injury.[6] Ruby testified she and Camara were in the road for approximately two to three minutes—not a trivial amount of time. She also testified she was attempting to break free of Camara's grasp as she was being dragged, creating the possibility she would extricate herself and run into oncoming traffic in an attempt to escape. Both Officer 1 and Officer 2 testified

---

5. Camara further argues that he lawfully crossed the road and, thus, there was no actual risk of bodily injury to Ruby. We find this argument unavailing. First, there is no finding by the district court that he crossed lawfully. Second, the risk Ruby would suffer bodily injury was the same whether Camara crossed legally or illegally, in part because she was struggling to get away from him as he dragged her across Redwood Road against her will.

6. Witness testified that Camara made bizarre statements about Ruby and Officer 2 testified that Camara's behavior was comparable to that of a person under the influence of narcotics. A jury could reasonably conclude from this testimony that Camara's ability to safely identify and avoid vehicles in the road was diminished as he crossed.

that, even at 10:00 at night, Redwood Road is a "very busy road" with "still a fair amount of traffic." And Detective testified that a car traveling the speed limit of forty-five miles per hour would produce "pretty serious" and potentially "fatal" injuries.

¶22 Just as a child is exposed to actual risk where she is "near or accessible to" a controlled substance, so too was Ruby exposed to actual risk of bodily injury[7]—trying to escape her attacker amid multiple lanes of cars driving past on a busy road late at night— despite not actually colliding with a car. *See Gallegos*, 2007 UT 81, ¶¶ 15, 18. Accordingly, there was sufficient evidence for a reasonable jury to conclude she was detained or restrained "in circumstances exposing [her] to risk of bodily injury." Utah Code § 76-5-301(2)(b).

### III. Alternative Arguments

¶23 Camara raises two alternative arguments in support of the district court's grant of the motion to arrest judgment. First, Camara asserts that this court can affirm the district court's ruling because the State failed to prove he acted knowingly. *See* Utah Code § 76-2-103(2) ("A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.");

---

7. We acknowledge that some level of exposure to risk of bodily injury is inherent in daily life. For instance, had Camara dragged her across a quiet cul-de-sac or placed Ruby in a car and simply driven away, Ruby likely would have been exposed to no more risk of bodily injury than people who willingly choose to engage in ordinary daily activities. But because those are not the circumstances here, we do not opine on whether a reasonable jury could find beyond a reasonable doubt that such activities would expose a person to actual risk of bodily injury. And we note, again, the State's agreement that the relevant statute requires something more than a mere hypothetical risk of injury.

*id*. § 76-5-301(2) (requiring proof an actor acted "intentionally or knowingly"). According to Camara, he did not intentionally detain Ruby in circumstances exposing her to risk of bodily injury because he purposefully waited for cars to pass before proceeding across the road. Rather than negating Camara's mens rea, the evidence showing he paused for passing vehicles sufficiently supports the jury's finding that he was well aware of the risks created by his conduct. After all, Camara did not have to be aware that his conduct was reasonably certain to cause injury, just that his conduct was reasonably certain to create a *risk* of injury. The State's evidence was more than sufficient to show Camara acted with the required mens rea.

¶24　Second, although he acknowledges that the legislature amended the kidnapping statute in 2001 to remove the requirement that the bodily injury be "serious," Camara nevertheless asks us "to make Utah's kidnapping statute more in unison with the rest of the country" because other states require "either a substantial risk, a serious injury, or both." Specifically, Camara urges this court to interpret the statute to require more than merely the risk of bodily injury by applying two rules of statutory interpretation—the canon of noscitur a sociis and the rule of lenity.

¶25　First, under the noscitur a sociis canon, "a word is known by the company it keeps," *Gustafson v. Alloyd Co., Inc*, 513 U.S. 561, 575 (1995), and we utilize it to give words grouped in a list related meanings, *see Richards v. Cox*, 2019 UT 57, ¶ 34, 450 P.3d 1074 ("Under the interpretive canon *noscitur a sociis*, we read associated words as bearing similar contextual meanings to each other."). Camara notes that the other subsections of Utah Code section 76-5-301(2) define kidnapping as (1) detaining an individual for "any substantial period of time," (2) holding an individual "in involuntary servitude," (3) detaining a minor without parental consent, and (4) moving an individual a "substantial distance or across a state line." He argues "risk of bodily injury" must be

interpreted to involve conduct that is similarly serious. Second, under the rule of lenity, this court must "interpret an ambiguous statute in favor of lenity toward the person charged with criminal wrongdoing." *State v. Rasabout*, 2015 UT 72, ¶ 22, 356 P.3d 1258.

¶26 But we have no need to resort to canons of statutory interpretation or the rule of lenity because the text of Utah Code section 76-5-301(2)(b) is not ambiguous. *See Marion Energy, Inc., v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 15, 267 P.3d 863 ("When the meaning of a statute can be discerned from its language, no other interpretive tools are needed." (cleaned up)); *Rasabout*, 2015 UT 72, ¶ 22 ("[T]he rule of lenity is not implicated unless a statute is ambiguous."). The statute uses the term "risk" with no modifiers like "substantial" or "likely." And risk, by definition, involves possibilities, not certainties or near certainties. *See Risk*, Merriam-Webster, https://www.merriam-webster.com/dictionary/risk [https://perma.cc/TU4F-ARDF] (defining risk as the "possibility of loss or injury"). Thus, the statute does not contain language requiring the level of risk for which Camara advocates. Utah Code section 76-5-302(3)(b) is clear on its face, and this court cannot rewrite an unambiguous statute or substitute its judgment for that of the Utah Legislature. *See State v. Jeffries*, 2009 UT 57, ¶ 13 n.3, 217 P.3d 265 ("The job of the legislature is to define crimes, prescribe penalties, and establish guidelines for prosecutors, judges, and juries for enforcing the law.").

CONCLUSION

¶27 The district court's order arresting judgment is reversed. We remand the matter with instruction to reinstate the jury's verdict finding Camara guilty of first-degree aggravated kidnapping and to resentence Camara accordingly.

———————